## GENERAL MOTORS ACCEPTANCE CORPORATION, Appellant,

v.

### Alphonso JONES, Debtor,

### Robert M. Wood, Trustee.

### No. 92–5351.

United States Court of Appeals, Third Circuit.

Argued Jan. 25, 1993.

Decided July 20, 1993.

Robert Szwajkos (Argued), Lavin, Coleman, Finarelli & Gray, Philadelphia, PA, for appellant.

David Paul Daniels, Jeannette M. Amodeo (Argued), David Paul Daniels, A Professional Corp., Camden, NJ, for appellees.

Before: STAPLETON and COWEN, Circuit Judges, and DUBOIS,* District Judge.

### OPINION OF THE COURT

STAPLETON, Circuit Judge:

These chapter 13 bankruptcy cases require us to determine the rate of interest which will assure that a secured creditor receives payments under a chapter 13 plan having a present value equal to the value of its allowed secured claim, as required by 11 U.S.C. § 1325(a)(5)(B)(ii). This is a question of first impression in this Circuit. We hold that the rate of interest under § 1325(a)(5)(B)(ii) is that which the secured creditor would charge, at the effective date of the plan, for a loan similar in character, amount and duration to the credit which the creditor will be required to extend under the plan. We will reverse the district court's judgment upholding the order of the bankruptcy court and will remand these cases for proceedings consistent with this opinion.

### I.

Appellee Jones possessed a Chevy pickup truck which he purchased pursuant to a financing agreement with appellant General Motors Acceptance Corporation (GMAC). Jones filed a voluntary petition and a plan under chapter 13 of the bankruptcy code, 11 U.S.C. §§ 1301 *et seq.* The value of the truck, as collateral, was less than the amount Jones owed to GMAC on the date of the filing, and Jones was able to reduce the amount of GMAC's secured claim down to the value of the collateral.[1] Jones's plan

---

* Honorable Jan E. DuBois, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. Section 506(a) of the bankruptcy code enables a debtor to bifurcate a creditor's claim, treating the claim up to the value of the collateral as a secured claim while treating as unsecured the amount of the claim that exceeds the value of the collateral. Section 506(a) states in relevant part that "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured

proposed to reduce the secured claim due to GMAC as of the filing date from $15,713.98 at 11.98% annual rate of interest, to $11,-500.00 at 10% interest. Appellee Jordan also possessed a GMC pickup truck purchased pursuant to a financing agreement with GMAC. The value of the truck as collateral also was less than the amount Jordan owed to GMAC. Jordan filed a plan proposing to reduce the secured claim owed to GMAC from $15,115.79 at 13%, to $9,700.00 at 10%. In both cases, GMAC objected to the interest rate, contending that a 10% rate was too low to provide GMAC with the present value of its allowed secured claim over the time of the plan, as required by § 1325(a)(5)(B)(ii).

In confirmation hearings on the two plans, the bankruptcy court held that the presumptive market indicator of the appropriate interest rate is the prime rate. The district court affirmed without opinion, and GMAC filed this appeal.

## II.

■ This Court has jurisdiction pursuant to 28 U.S.C. § 158(d). The issue presented in this case is a question of law, over which this Court has plenary review. *Meridian Bank v. Alten,* 958 F.2d 1226 (3d Cir.1992).

## III.

Chapter 13 of the Bankruptcy Code provides for the adjustment of debts for individual debtors with regular income. A chapter 13 case begins when the debtor files a voluntary petition of bankruptcy. This petition will stay most proceedings by creditors against the debtor and his property. Generally, the debtor must propose a plan for payment of his debts within fifteen days of the filing of the petition.[2] Creditors with an interest in the plan are given twenty-five days' notice[3] before the plan comes before the bankruptcy court for confirmation.

■ In situations known as "cramdowns", the plan may be confirmed over the objection of a secured creditor if certain conditions are

met. Specifically, in a chapter 13 "cramdown", a debtor may retain property in which a secured creditor has a security interest, even if the secured creditor would prefer to repossess and liquidate the property as it would be entitled to do in the absence of a bankruptcy filing. In exchange for giving the debtor a right to continue possession of the property, § 1325(a)(5)(B) directs two things: (i) the secured creditor shall retain a continuing lien on the property; and (ii) the secured creditor shall receive from the debtor "the value, as of the effective date of the plan, of such property to be distributed under the plan on account of such claim [which shall be] not less than the allowed amount of such claim." 11 U.S.C. § 1325(a)(5)(B)(ii).

In order for the secured creditor to get payments over time under the plan having a present value equal to the allowed amount, as the above quoted statutory language directs, the debtor normally pays interest on the allowed amount. Unfortunately, the statute is silent about how to determine the interest rate.

## IV.

■ The concept of present value recognizes that money received after a given period is worth less than the same amount received today. This is the case in part because money received today can be used to generate additional value in the interim. How much additional value can be generated depends on who is investing the money received today and in what market. It necessarily follows that determining the present value of money to be received in the future requires a selection of the relevant investor and the relevant market. That selection should be made on the basis of the purpose for which one is determining present value. In this context, we look to the purpose of § 1325(a)(5)(B)(ii) which, as we understand it, seeks to put the secured creditor in an economic position equivalent to the one it would have occupied had it received the allowed secured amount immediately, thus ter-

---

claim to the extent that the value of such creditor's interest … is less than the amount of such allowed claim."

2. Fed.R.Bankr.P. 3015(b).

3. Fed.R.Bankr.P. 2002(b).

minating the relationship between the creditor and the debtor. In determining present value, we therefore look to the additional value that the secured creditor could be expected to generate in the regular course of its business if the plan provided for an immediate, rather than a deferred, payment of the allowed secured amount.

### A.

■ Some courts, including the bankruptcy court in the cases we are here reviewing, have suggested a "cost of funds" theory which would determine present value by looking to the creditor and the market in which the creditor borrows capital. *See, e.g., Matter of Jordan,* 130 B.R. 185 (Bkrtcy. D.N.J.1991); *In re Shannon,* 100 B.R. 913, 932 (S.D.Ohio, 1989). According to the "cost of funds" theory, a creditor in a cramdown is deprived of the right to immediately repossess and liquidate the collateral and thus realize an immediate inflow of cash. The creditor, under this view, can cover for this loss, however, by borrowing funds equivalent in value to the funds it would have realized had it been allowed to repossess and liquidate its secured interest. Accordingly, a secured creditor can be protected against any loss occasioned by delayed payment under the plan if it is paid interest on the allowed secured amount at the interest rate it would pay in the market in order to borrow the funds needed to replace those being temporarily withheld. *See Matter of Jordan* at 190 ("[w]e conclude that the market rate time value of money is most accurately measured for chapter 13 present value purposes by the cost of funds approach, which seeks to compensate the creditor's cost of borrowing to replace funds that would otherwise be available upon liquidation of its collateral.")

We view the "cost of funds" approach as falling short of the statutory objective. Paying the creditor the cost of the funds unavailable to it during the period of the plan will partially compensate the creditor for the loss of opportunity it would have had if it had been able to repossess the collateral. There is more involved, however, than the mere cost of funds. When a cramdown plan calling for payments to a secured creditor over time is confirmed, the creditor is forced both to absorb the costs of deferred payment *and* to continue a lending relationship with the debtor past the point contemplated in the original agreement. A plan under Chapter 13 thus effectively coerces a new extension of credit in which the creditor is required to assume not only the cost of capital over the deferral period but also the cost of sustaining the lending relationship over that period. The "cost of funds" approach inappropriately compensates the creditor for only the former category of cost.

■ Any creditor extending credit anticipates that over the course of the loan it will recover, in interest, its cost of capital and its cost of service, as well as a profit. When we focus on the present value of chapter 13 deferred payments to a secured creditor who has been forced to extend this new credit, this fact should not be ignored. It is only by acknowledging the coerced loan aspects of a cramdown and by compensating the secured creditor at the rate it would voluntarily accept for a loan of similar character,[4] amount and duration that the creditor can be placed in the same position he would have been in but for the cramdown.

### B.

■ We think that the model of a coerced loan presents a more complete picture of what happens in a cramdown, and should provide the starting point for determining the appropriate interest rate under § 1325(a)(5)(B)(ii). The Sixth Circuit has stated tersely and well the basic idea of the "coerced loan" theory: "In effect the law requires the creditor to make a new loan in the amount of the value of the collateral rather than repossess it, and the creditor is entitled to interest on his loan." *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427, 429 (6th Cir.1982). Courts have implement-

---

4. By a loan of "similar character" we mean a loan that the creditor regularly extends to other debtors who are not in bankruptcy but who are otherwise similarly situated to the debtor who is the recipient of the loan coerced by the chapter 13 proceeding and who are seeking the same kind of credit (*e.g.,* auto loan, home equity loan, etc.).

ed the "coerced loan" approach by determining the appropriate interest rate to be equal to the interest rates of "similar loans" made in the region.[5] Some have made specific reference to the interest rates of similar loans made in the region by the actual creditor who is effectively being coerced into extending the loan by the chapter 13 proceeding.[6] While the difference between the rates charged by the particular creditor in the regular course of its business in a competitive market will not differ materially from those charged by competing creditors in that market, we believe the theory behind § 1325(a)(5)(B)(ii) indicates that the appropriate rate is that charged by the particular creditor forced to extend credit. If that creditor receives interest at a rate equal to the rate it charges in the regular course of its business in the region for loans of similar character, amount and duration, that creditor will be placed in approximately the same position it would have occupied had it been able simply to repossess the collateral at the time of the bankruptcy.

We say "approximately", because we realize that the "loan" coerced from a creditor in GMAC's position is not the precise equivalent of a new loan that GMAC would extend to a client. In particular, since GMAC had already extended loans to Jones and Jordan, GMAC incurs no costs of actually issuing new loans. Additionally, the trustee, who collects payments from the debtor and distributes them to the creditors, fulfills some of GMAC's monitoring function and is paid by the debtor. See In re Fisher, 29 B.R. 542, 545 (Bkrtcy.D.Kansas 1983). GMAC, however, retains some monitoring and other relational costs in its dealings with the trustee

and the bankruptcy court, and it is unclear as an empirical matter whether GMAC's net costs in this area increase or decrease with the introduction of a cramdown.[7] Both the absence of a "new loan" cost and the diminution, if any, of monitoring and other relational costs make the "coerced loan" somewhat less costly to GMAC than a voluntarily elected new loan.

Other factors, however, tend to make "coerced loans" more costly to the secured creditor than new loans would be. For example, loans coerced in cramdown proceedings are frequently loans without an "equity cushion". An equity cushion exists when the appraised value of the collateral is greater than the value of the loan. A lender seeks to lend on an equity cushion, among other reasons, in order to hedge against the depreciation in the value of the collateral. In these cases, the allowed amount of GMAC's claim has been made equivalent to the appraised value of the collateral, thus depriving the creditor of an equity cushion and making these "coerced loans" more costly than new loans that the creditor would have voluntarily extended. In a free, rather than a coerced, market the creditor would increase the lending rate to compensate for the absence of an equity cushion. Additionally, if the creditor had been allowed to freely construct and extend the loans coerced by the cramdown proceedings, it would have increased the lending rate based on the debtors' demonstrably poor credit history.

■ Both the "equity cushion" and the practice of gauging the lending rate to the debtor's credit history are important to a

5. See United Carolina Bank v. Hall, 993 F.2d 1126 (4th Cir.1993); In re Hardzog, 901 F.2d 858, 860 (10th Cir.1990); United States v. Arnold, 878 F.2d 925, 930 (6th Cir.1989); United States v. Neal Pharmacal Co., 789 F.2d 1283 (8th Cir. 1986); Matter of Southern States Motor Inns, Inc., 709 F.2d 647, 651–52 (11th Cir.1983), cert. denied, 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984); Memphis Bank & Trust v. Whitman, 692 F.2d 427, 431 (6th Cir.1982); In re General Development Corp., 135 B.R. 1008 (Bkrtcy.S.D.Fla.1991); In re Mellema, 124 B.R. 103 (Bkrtcy.D.Colo.1991).

6. E.g., In Re Mellema, 124 B.R. 103 (Bkrtcy. D.Colo.1991).

7. See In re Cassell, 119 B.R. 89, 92 (W.D.Va. 1990) ("a creditor almost certainly incurs legal, managerial, and clerical costs in monitoring and accounting for a Chapter 13 claim that are not present in a standard loan situation. Rather than being less, it appears to the court that there is a good chance that the creditor's transaction costs increase for bankruptcy claims. Wherever the truth may lie, whether the costs incurred by the creditor as a result of Chapter 13 are less than the costs that would be incurred in regard to a new loan is a complicated empirical question upon which no evidence has been offered....")

creditor trying to decrease the costs to itself of anticipated debtor default. At the same time, we acknowledge that some courts may have overestimated the degree to which risk of loss from default is increased in a cramdown even where there is no equity cushion and the lending rate does not reflect the debtor's bad credit rating. There are aspects of the bankruptcy process itself that counterbalance the factors of the debtor's credit history and the absence of an equity cushion.[8] Nevertheless, we are persuaded that the elements that would tend to make "coerced loans" more costly to the secured creditor than new loans, and the elements that would tend to make "coerced loans" less costly to the secured creditor than new loans will generally balance out and that it would be difficult or impossible to empirically demonstrate and quantify the cost differential between new and coerced loans. More important, while determining present value by reference to the creditor's rate for new credit in analogous situations produces only an approximation and may not always put the creditor in precisely the same position as it would have been in absent the plan, it is preferable to the competing "cost of funds" approach which ignores the fact that a coerced loan is being made and that the creditor will incur costs in connection with that loan.[9]

■ It is true that treating a cramdown as a coerced loan will result in a § 1325 interest rate that includes an element of profit that the creditor typically hopes to make on its loans. Some courts have objected that "profit is not an appropriate factor to consider in determining present value in a

chapter 13 case." *Matter of Jordan,* 130 B.R. at 189. *See also In re Fisher,* 29 B.R. 542, 545 (Bkrtcy.D.Kansas 1983). *But c.f. In re Cassell,* 119 B.R. 89, 92 (W.D.Va.1990). On the contrary, because the objective of § 1325(a)(5)(B)(ii) is to put the creditor in the same position it would have been in if it had been allowed to end the lending relationship at the point of the bankruptcy filing by repossessing the collateral, we believe that it would be inappropriate to attempt to exclude consideration of "profit" from a determination of the § 1325 interest rate. Moreover, we perceive no unfairness in including the profit component that anyone lending money in a commercial context expects. The effect of chapter 13 is to extend, in modified form, the lending relationship that creditor and debtor created by contract. The instant lending relationship always included a mutual anticipation of profit; specifically, GMAC (as the financing arm of General Motors) valued the monetary gain more than the trucks, and the appellees valued the trucks more than the money. For a court to order the disgorgement of the creditor's profit, while laboring to preserve the profit of the debtor, would be a distortion of the lending relationship which we believe the bankruptcy code did not intend.

Our analysis and conclusion regarding the appropriate interest rate for purposes of § 1325(a)(5)(B)(ii) finds support in the better reasoned cases. *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427 (6th Cir.1982) is an early chapter 13 case and, like the instant case, involved an automobile lien. The court in *Memphis Bank* found that "[t]he theory of the statute is that the creditor is making a

8. The debtor has both demonstrated commitment and increased incentive not to default once in bankruptcy. Moreover, the plan of repayment will have been reviewed and approved by the court as feasible in the light of the debtor's repayment capacity. *See In re Fowler,* 903 F.2d 694, 697; *In re Shannon,* 100 B.R. 913, 939.

9. Some courts, rather than looking to the creditor's cost of making a loan (the "coerced loan" theory) or the creditor's cost of getting a loan (the "cost of funds" theory), have looked to the debtor's cost of getting a loan. *See, e.g., In re Camino Real Landscape Maintenance Contractors,* 818 F.2d 1503 (9th Cir.1987); *United States v. Doud,* 869 F.2d 1144 (8th Cir.1989); *In re*

*Fowler,* 903 F.2d 694 (9th Cir.1990). In an attempt to calculate the appropriate interest rate, these cases have typically fashioned formulas designed to approximate the cost of the debtor's borrowing. One of the more common formulas is to take a "riskless" rate of interest, such as the rate of return on a treasury instrument, and tack on a point or two for consideration of risk of the debtor's default. We decline to follow these cases both because of the problems associated with judicial creation of interest rates, *see In re Hardzog,* 901 F.2d 858, 860 (10th Cir.1990), and because the rationale behind § 1325(a)(5)(B)(ii) links the interest rate to the present value of the deferred payments to the creditor.

new loan to the debtor in the amount of the current value of the collateral." *Memphis Bank* at 431. Given its view that the statute coerces a loan from the creditor in a chapter 13 proceeding, the court concluded that "the most appropriate interest rate is the current market rate for similar loans at the time the new loan is made, not some other unrelated arbitrary rate." *Id.* at 431.

In the case of *In re Cassell,* 119 B.R. 89 (W.D.Va.1990), also a chapter 13 case involving an automobile lien, a district court carefully considered and then rejected a "cost of funds" approach, finding that "[t]he best method to ascertain the value of money to a creditor paid over a period of time is to determine what that particular creditor routinely receives as negotiated finance charges over the period of time with similar collateral." *In re Cassell* at 93 (quoting *Matter of Cooper,* 11 B.R. 391, 395 (Bkrtcy.N.D.Georgia 1981)).

The Tenth Circuit, in *In re Hardzog,* 901 F.2d 858 (10th Cir.1990), a case interpreting a similar interest rate provision in chapter 12 of the bankruptcy code, has also accepted the "coerced loan" approach for determining interest rates in bankruptcy proceedings, holding that "Bankruptcy Courts should use the current market rate of interest used for similar loans in the region." *Hardzog* at 860. A bankruptcy court within the Tenth Circuit has applied *Hardzog* to a chapter 13 case involving an automobile lien, holding that the appropriate rate of interest is "[t]he prevailing market rate of interest for similar loans in the region [which] is best exemplified by [the particular creditor's] loans recently made in the marketplace in this region." *In re Mellema,* 124 B.R. 103, 107 (Bkrtcy. D.Colo.1991).

Moreover, we believe the coerced loan approach has appeal from a pragmatic perspective as well. Since chapter 13 cases adjust the debts of the individual wage earner, such cases tend to be rather high in volume and low in absolute value, making a reduction of the litigation and transactions costs of chapter 13 cases an important prudential consideration. We believe that in most instances, regularly maintained documents of the creditor should make it possible for the debtor and creditor to stipulate on the interest rate the creditor would charge for a new loan of similar character, amount and duration.

■ In sum, because the effect of the instant cramdowns was to force GMAC to extend loans to appellees for the duration of the plans, we hold that the appropriate interest rate under § 1325(a)(5)(B)(ii) is the interest rate that GMAC would charge, at the time of the effective date of the plans, for a loan of similar character, amount and duration.

V.

■ As we have indicated, our selection of the coerced loan approach is based on our understanding of the objective of § 1325(a)(5)(B)(ii) and our view of the importance of minimizing the expense of getting a chapter 13 plan formulated and approved. We conclude that it would be consistent with the statutory objective and would reduce litigation expenses if we imposed an additional rule of practice in this area. The contract rate of interest is, of course, the rate that the creditor voluntarily agreed to accept at an earlier date. While in some cases the passage of time will have seen a material increase or decrease in the lending rate of the creditor, the contract rate is a fair place to begin.[10] In the absence of a stipulation regarding the creditor's current rate for a loan of similar character, amount and duration, we believe it would be appropriate for bankruptcy courts to accept a plan utilizing the contract rate if the creditor fails to come forward with persuasive evidence that its cur-

10. There is, in the legislative history of the bankruptcy code, some support for the idea that the contract rate is to be accorded some privileged significance when determining the appropriate interest rate. In the discussion of § 502(b) of the code, a general section regarding the allowance of claims, the drafters noted that "bankruptcy operates as the acceleration of the principal amount of all claims against the debtor. One unarticulated reason for this is that *the discounting factor for claims after the commencement of the case is equivalent to contractual interest rate on the claim."* Bankruptcy Reform Act of 1978, P.L. 95–598. 1978 U.S.Code Cong. & Admin.News, 5787, 5849 (emphasis added).

rent rate is in excess of the contract rate.[11] Conversely, utilizing the same rebuttable presumption approach, if a debtor proposes a plan with a rate less than the contract rate, it would be appropriate, in the absence of a stipulation, for a bankruptcy court to require the debtor to come forward with some evidence that the creditor's current rate is less than the contract rate.[12]

## VI.

■ We hold that the bankruptcy and district courts erred in utilizing the prime rate to determine whether the proposed plan, as required by § 1325(a)(5)(B)(ii), provided for payments to the creditor having a present value equal to the value of its allowed secured claim. The appropriate interest rate for this purpose is the rate of interest currently being charged by the creditor in the regular course of its business for loans similar in character, amount and duration to the loan being coerced in the cramdown. It is further appropriate, we hold, for a bankruptcy court to treat the contract rate as a proxy for the creditor's current rate in the absence of a stipulation or evidence to the contrary. Accordingly, we will reverse and remand to the district court with instructions that it vacate its judgment and remand to the bankruptcy court for proceedings consistent with this opinion.

---

11. Some courts have adopted the contract rate of interest as a cap on the interest rate to be required under § 1325(a)(5)(B)(ii). *See, e.g., United Carolina Bank v. Hall,* 993 F.2d 1126 (4th Cir.1993); *In Re Mellema,* 124 B.R. 103, 107–08 (Bkrtcy.D.Colo.1991). We decline to impose such a cap because we believe it would be inconsistent with the coerced loan theory to do so. A cap would give a debtor the benefit of interest rates that fall after the original contract, but deny a creditor compensation on its coerced loan for interest rates that climb after the original contract. In those situations where a cap would deny the creditor the benefit of rising rates, it would frustrate the purpose of § 1325(a)(5)(B)(ii) by potentially making the creditor worse off than it would have been had it been able to levy on the collateral at the time of the bankruptcy.

12. Because the issue is not before us, we take no position on whether the contract rate should constitute a cap on the interest rate where the creditor is not undersecured and, accordingly, has not had its expectations frustrated through the "bifurcation" provisions of § 506(a). *See, e.g., First National Fidelity Corp. v. Perry,* 945 F.2d 61, 66 (3d Cir.1991).