In re Clement Anton Joe ZERR and Pauline Marie Zerr, Debtors.

Clement Anton Joe ZERR and Pauline Marie Zerr, Plaintiffs,

v.

**MONTEZUMA CREDIT UNION, Defendant.**

Bankruptcy No. 92–41702–12.
Adv. No. 93–7034.

United States Bankruptcy Court, D. Kansas.

May 3, 1994.

Clement Anton Joe Zerr, Pauline Marie Zerr, pro se.

Philip L. Turner, Dan Turner, Topeka, KS, for debtors.

Eric D. Bruce, Wichita, KS, for defendant.

Calvin Karlin, Lawrence, KS, for Farm Credit Bank.

Eric Rajala, Overland Park, KS, Chapter 12 Trustee.

## MEMORANDUM OPINION AND ORDER

JULIE A. ROBINSON, Bankruptcy Judge.

This matter comes before the Court pursuant to the objections to confirmation of the debtors' Amended Chapter 12 Plan filed by

Montezuma Credit Union ("Montezuma"), Farm Credit Bank ("FCB") and the Chapter 12 Trustee. Also before the Court are FCB's motion to dismiss the debtors' bankruptcy case, the motion by FCB for relief from stay as to the Litson property, the motion of Marie Litson to lift stay, the motion of FCB for relief from stay or for adequate protection, the motion of Montezuma/Great Plains Federal Credit Union for relief from stay, debtor's complaint to avoid the liens of Montezuma, and Montezuma's motion for summary judgment. A hearing was held on April 4, 1994. Clement Anton Joe Zerr and Pauline Marie Zerr ("debtors") appeared in person and by and through their attorney, Philip Turner. The Chapter 12 Trustee, Eric Rajala, appeared pro se. Montezuma appeared by and through its attorney, Eric Bruce. FCB appeared by and through its attorney, Calvin J. Karlin. After hearing the evidence, the Court ruled from the bench and is issuing this written Memorandum Opinion and Order consistent with that ruling.

### JURISDICTION

The Court has jurisdiction over this proceeding. 28 U.S.C. § 1334. This is a core proceeding. 28 U.S.C. § 157(b)(2)(B), (G), (K) and (L).

### FINDINGS OF FACT

The debtors, Clement Anton Joe Zerr and Pauline Marie Zerr, are family farmers who filed a Chapter 12 petition on September 15, 1992. The debtors did not file any schedules until October 29, 1992. The schedules were patently deficient, not itemizing assets or values nor providing any information about budget, income and expenses. The Court ordered the debtors to refile their schedules within thirty days of December 4, 1992. The debtors missed this deadline, filing their first amended schedules on January 7, 1993. On February 8, 1993, Judge John T. Flannagan issued a Show Cause Order requiring the debtors to resubmit schedules and statement

of affairs because the original schedules were the "worst prepared forms that the court had ever seen". The original schedules contained almost no information, listing zeros instead of actual figures for income, expenses and value of assets. Judge Flannagan went on to note that the first amended schedules "now ranks as the worst the court has ever seen." The first amended were "garbled, incomplete, unmarked, unpaginated and generally confusing." Finally, on February 26, 1993, some five months after the petition was filed, the debtors filed second amended schedules that contained some information with which the creditors and trustee could evaluate the debtors' financial affairs.[1]

Meanwhile, the debtors did not file a plan within 90 days following the order for relief as set forth in 11 U.S.C. § 1221. In December, 1992, they obtained a 30 day extension to file a plan by January 13, 1993. Before that date, they obtained an extension to file a plan by January 23. The debtors missed this deadline, filing their Chapter 12 plan on January 25, 1993. On March 3, 1993, the plan came on for confirmation, and confirmation was denied. The Court granted the debtors 15 days to file an amended plan. Once again the debtors missed the deadline, filing their Amended Plan on March 19, 1993. At that point, the confirmation hearing was continued again and again while the debtors and objecting creditors conducted discovery. The discovery process was considerably delayed by the debtors' motions to extend time for discovery, motion to extend time to respond to summary judgment motion, and motion to continue pretrial hearing. The debtors had also objected to a request for production and moved to quash a 2004 exam back in the fall of 1992.

Finally, on April 4, 1994, some eighteen months after the debtors filed their Chapter 12 petition and some fourteen months after they filed their Amended Chapter 12 Plan ("plan"), the confirmation hearing was held.

---

1. However, the debtors failed to comply with Judge Flannagan's requirement that Chapter 12 debtors make disclosures as set forth in *In re VanVleet*, Case No. 92–40461–12 (Bankr.D.Kan. Oct. 20, 1992), regarding among other things: the costs related to each income source; assumptions used for income and expense projection;

expected amounts and timing from each income source; separate itemization of government payments and non-farm income; and payment projected for each creditor, the trustee and timing of each. In fact, the debtors did not provide this information to the creditors and trustee until the eve of the confirmation hearing.

FCB objected to confirmation on grounds that the plan failed to provide for it to retain its lien and failed to pay it the present value of its allowed secured claim. The trustee objected to confirmation on the ground that the plan proposed to give the unsecured creditors a security interest in real estate and to pay them for five years with a balloon of the balance due in the fifth year, while the better course would be to liquidate the non-exempt property and pay the unsecured creditors. Montezuma objected that the plan failed to treat their claim as secured.[2] The trustee, Montezuma and FCB also objected to confirmation on the ground that the plan was not feasible. In addition, FCB moved to dismiss the case.

FCB has an allowed claim of $727,822.18, which is secured in the amount of $668,000 and unsecured in the amount of $59,822.18. The debtors' plan proposes to pay FCB's secured claim over 30 years at an 8% interest rate.

Montezuma filed a proof of claim for $258,-015.40, which it contends is secured in whole or part by: machinery and equipment; now and hereafter acquired accounts receivable; cattle and livestock now and hereafter acquired; vehicles; furniture and fixtures; farm products; feeding liens and other items. The debtors dispute the amount they owe Montezuma and contend that the credit union's security interest is unperfected and their lien avoidable; so the debtors' plan proposes to treat Montezuma as unsecured.

The debtors propose to pay the unsecured creditors, including Montezuma and the unsecured portion of FCB's claim, 100% over a period of five years, based on a ten year amortization at 6% interest. The debtors calculate that after five years of payment on $362,235.22 of unsecured debt, they will owe the unsecured creditors a balance of $168,-952.37, which they will pay by selling or refinancing the "Litson property".

Pending determination of the nature and extent of Montezuma's claim, on December 4, 1992, Judge Flannagan ordered the debtors to segregate all proceeds derived from the sale of items that Montezuma claimed a secu-rity interest in. Debtor Clement A.J. Zerr testified at the confirmation hearing that he understood that he was not to spend money he received from cattle sales because Montezuma claimed a security interest in cattle. Zerr further acknowledged that his 1992 tax return reflected income from cattle or live-stock sales in the amount of $75,900, but that there was only about $65,000 in proceeds on deposit in their cash collateral account. Zerr could not account for the other $10,000, but surmised that they had sold some cattle in which Montezuma had no interest. He further testified that he had sold no cattle since 1992 and had no other cash collateral to account for. Based on the debtor's demean-or while testifying and his unfamiliarity with his financial affairs, the Court finds that the debtor did not willfully violate the terms of the Court's Order on Motion of Montezuma Credit Union Segregating Cash Collateral.

Zerr testified that prior to filing this bank-ruptcy the debtors had grown crops and operated a feeder cattle business. Zerr fur-ther testified that although the plan indicated the debtors would no longer be in the feeder cattle business, they might reenter the busi-ness if they could obtain some financing. Zerr testified that they otherwise intended to devote themselves full time to growing wheat, milo and other crops.

At the close of the evidence, the Court denied confirmation, denied any requests for additional time to file another amended plan, and granted the motion to dismiss.

## CONCLUSIONS OF LAW

### PLAN FAILS TO COMPLY WITH 1225(a)(5)

The debtors proposed to pay FCB its al-lowed secured claim of $668,000 over a term of 30 years, with a discount or interest rate of 8%. FCB did not accept the debtors' plan and objected that the plan failed to provide that FCB would retain its lien; and further that the plan failed to pay the allowed amount of its secured claim, in proposing a 30 year term with an 8% interest rate.

---

**2.** For reasons that will become apparent in this opinion, the Court declines to rule on the issue of the nature and extent of Montezuma's claim, which is the subject of a complaint for lien avoidance filed by the debtors.

■ In the aftermath of *In re Hardzog,* 901 F.2d 858 (10th Cir.1990), the Chapter 12 debtor must propose to pay the secured creditor no less than the full amount of its allowed claim plus interest at the "market rate," that being the current market rate of interest for "similar loans" in the region. In *Hardzog,* the Tenth Circuit rejected the Eighth Circuit's approach in *United States v. Doud,* 869 F.2d 1144 (8th Cir.1989), of computing the market rate by adding a 2% risk factor to the rate of a risk-free loan. Instead, the Tenth Circuit opted for an approach that is "predicated upon the theory that the lender is making a new loan to the debtor," and that all the creditor is entitled to is the same rate the creditor would receive in making a similar loan in the region. *In re Hardzog,* 901 F.2d at 860.

*Hardzog* provides no guidance on what constitutes a "similar loan." The debtors contend that a similar loan would be a restructured loan, which FCB enters into with troubled borrowers outside of bankruptcy.[3] FCB contends that a similar loan is a new loan, with an interest rate based in part on the borrowers' history and circumstances.

In *In re Stratford Assocs. Ltd. Partnership,* 145 B.R. 689 (Bank.D.Kan.1992), Judge John K. Pearson held that a "similar loan" in the context of a Chapter 11 reorganization, would be a workout loan outside of bankruptcy, such that the appropriate interest rate would be within the range of interest rates charged on workout loans in the region.

■ This Court, however, thinks that at least with respect to a Chapter 12 reorganization, the new loan rate is a more appropriate measure of the market rate in the region. Certainly *Hardzog* indicates that market rate is based on the assumption that the parties are entering into a new loan, albeit a coerced loan. *See In re Hardzog,* 901 F.2d at 860 ("Chapter 12 is predicated upon the theory

that the lender is making a new loan to the debtor").

While FCB's witness acknowledged that there is a market for restructured farmland loans, and that FCB has written such loans at lower than new loan rates, imposing a workout or restructured loan interest rate would unduly prejudice the creditor. A lender may be well advised to restructure a loan with a troubled borrower outside of the bankruptcy arena in order to avoid the attendant delay and regiment of bankruptcy or the delay and potential loss that would be suffered in a foreclosure. However, once the borrower files a Chapter 12 bankruptcy, and the lender is subjected to the automatic stay, the bifurcation of its claim, and other impairments, the lender should not be coerced into making the loan it would make to avoid all of that. The Chapter 12 secured creditor is without a number of the protections or advantages available in a Chapter 11 case, such as the absolute priority rule, the § 1111(b) election and the ability to propose a plan or appoint a trustee who can propose a plan. A workout or restructure interest rate may be an appropriate rate in a Chapter 11 setting, where the creditor can propose its own plan, elect away the bifurcation of its claim or expect to receive more on the unsecured portion of its claim if the owners want to continue in the business. But in the context of a Chapter 12 where the creditor is without this array of options it is unduly prejudicial to impose a workout rate on the creditor.

■ FCB presented evidence that it has written a substantial number of the farmland loans in the county where the debtors live and farm, and in the regional six county area. FCB's witness testified that FCB has 73% of the real estate debt and 66.4% of the loans in the region. Thus, FCB's interest rate on

---

3. The debtors' figure of 8% is based on alternative theories. They argue that 8% is a restructure rate, but they presented no evidence as to the **current rate or range of rates** that FCB charges on restructured loans. FCB's witness testified that while FCB has written restructured loans in the region, in the last two years it has not written such a loan with an interest rate as low as 8%. In the alternative, the debtors argue that FCB is subject to the limitations on interest imposed by 12 U.S.C. § 85, which relates to

National Banks. However, FCB is not governed by Chapter 2 of Title 12, as it is not a national banking association within the meaning of that chapter. FCB is governed by 12 U.S.C. §§ 2001 *et seq.,* relating to the Farm Credit System, which provides for the board of directors of the Farm Credit Bank to periodically determine the terms and conditions and rate or rates of interest or discount for loans and discounts made by a Farm Credit Bank. *See* 12 U.S.C. § 2016.

new loans secured by real estate can be considered the market rate in the region.

■ FCB's witness testified that none of the banks are offering 30 year fixed rate loans in the area, and that while FCB offers farmland loans with terms ranging from 21 to 30 years, 8% is not the market rate for such loans. Thus, despite its objection to the debtors' proposal to pay FCB over a 30 year term, FCB acknowledged that it is writing 30 year loans secured by farm land. In fact, the term of the debtors' loan was 30 years. FCB failed to demonstrate any compelling reason why these debtors ought not to be able to reamortize their debt with a 30 year loan.

FCB's witness further testified that if FCB wrote a new 30 year loan to these debtors, it would charge them an interest rate of 11.1% which it computed by adding a risk factor of 1.2% to the 9.85% rate it currently charges "low risk" customers on new loans secured by real estate. FCB based the 1.2% risk factor on the "Five C's": the debtors' credit history, their character, the conditions of the loan, their capacity to repay, and their capital and collateral. FCB characterized the debtors' character and credit history as "not superb;" and considered the conditions of the loan weak, based on the debtors' troubled operations, their declining earnings and history of default. In short, FCB assessed a risk factor at least in part based on the fact that these debtors have been in default, continue to be in default and are now in bankruptcy proposing a plan that FCB perceives as unfeasible.

The premise of a coerced loan approach is to place the lender in substantially the same position as if it had been able to end the lending relationship and foreclose on the collateral. *See General Motors Acceptance Corp. v. Jones,* 999 F.2d 63, 68 (3d Cir.1993). The Court cannot ignore that a coerced loan does not place the lender in exactly the same position, for the lender must make a 100% loan to a borrower who is by definition in default or at risk, something the lender may decline to do at any interest rate, given the choice. However, the Court cannot ignore the fact that there is a silver lining in the Chapter 12 cloud. First, the debtor is not allowed to proceed without an independent determination by the Court that the plan is feasible. Second, the debtor is required to act responsibly, to monitor its own progress and report periodically to the trustee who in turn monitors the debtor's progress. Third, the debtor has sought and obtained a comprehensive means of reorganization, which is typically more successful than a piecemeal approach.

■ Any attempt to quantify the risks of a coerced 100% loan, versus the benefits of a Chapter 12 would be a problematic and torturous exercise. Moreover, the Court cannot lose sight of the premise that paying the secured creditor the market rate for new loans is an equitable method to restore the transactional relationship between the debtor and creditor while placing the creditor in substantially the same position as it would be had it foreclosed and commenced a transactional relationship with a new borrower. Thus, any adjustment to the new loan rate for risk or benefit would be entirely inappropriate.

■ Therefore, the debtor's plan is not confirmable under § 1225(a)(5) as FCB's allowed secured claim must include interest at the rate of 9.85%, FCB's current interest rate for low risk borrowers.[4]

## PLAN IS NOT FEASIBLE

Section 1225(a)(6) requires the court to find that the debtors will be able to make all payments under the plan and comply with the plan. The Court's task was complicated in this case by the debtors' failure to timely make *VanVleet* disclosures. Literally on the eve of the confirmation hearing, the debtors provided the parties with the assumptions underlying their plan and their projected income and expenses for the life of the plan. At the confirmation hearing, the debtors

---

**4.** *Hardzog* indicates that there may be special circumstances in which the "current market rate of interest used for similar loans in the region" is not appropriate. *In re Hardzog,* 901 F.2d 858, 860 (10th Cir.1990). At least one bankruptcy court has construed that to mean that the contract rate should prevail when it is lower than the market rate. *See In re Mellema,* 124 B.R. 103 (Bankr.D.Colo.1991). Neither the debtors nor FCB argued that the contract rate should be considered in this case.

amended at least one assumption that had a significant effect on their projected income from crops.[5]

■ Most of the debtors' projected income will come from sales of wheat, milo and barley. The debtors have glowingly optimistic projections about their future production. Their plan is based on assumptions that they will have gross income from crop sales well in excess of $100,000 each year; yet their 1992 tax return showed gross crop income of $37,361 and their 1993 return showed gross crop income of $42,723. The debtors offered no explanation as to why their income will increase so dramatically. Although they explained that they would devote themselves full time to crops and no longer feed cattle, they did not satisfactorily demonstrate how their acreage would yield the projected production. In fact, their assumptions in that regard were inconsistent. In one exhibit they projected their wheat production would be 36 bushels per acre; in another exhibit they projected they could produce 30 bushels of wheat per acre. Furthermore, their assumptions included projections for 1993 income, which when compared to the actual figures for 1993, illustrate how far off the mark their other projections might be. While the debtors projected gross crop income of $101,878, their 1993 tax return shows they had gross crop income of $42,723, less than half the figure they projected.

The debtors also projected that their income would include $10,000 from rental of 1000 acres of pasture available to them now that they were no longer feeding cattle. Yet the debtors failed to demonstrate or discuss the feasibility or likelihood of finding a lessee.

Even while maintaining that they would increase production, the debtors assumed that their fuel, fertilizer, labor, repair and maintenance expenses would either remain stable or decrease. They assumed that their gasoline and fuel expense would be about $16,000 a year, based on a five year "average" of actual fuel expense that failed to account for the $20,000 they owe a fuel vendor but have never paid. They also based their projected fertilizer expense on a five year average, which seems inconsistent with planting more acreage or otherwise increasing production.

Again, a comparison of their projections with actual expenses in the last two years is enlightening. The debtors' plan is based on an assumption that their farm expenses will be about $56,000 a year. But in 1992, their farm expenses were $62,547; and in 1993 their farm expenses were $94,007 (they had projected $56,688 in 1993).

Two other feasibility problems are worth noting, having been raised in the trustee's objection to confirmation. The debtors, perhaps realizing how slim their cushion, if any, are proposing to pay the unsecured creditors outside of the plan after the third year, to avoid having to pay a trustee fee on those distributions. This provision in their plan violates § 1225(b)(1)(B). The debtors also propose to convert the unsecured creditors into secured creditors, a novel proposition, with a security interest in the "Litson property", which the debtors will then liquidate in the fifth year to pay off the unsecured creditors. Yet, the debtors have failed to show that this provision is feasible, in light of the status of the Litson property. The debtors are buying the Litson real estate on a contract for deed, and have failed to pay Marie Litson their annual payments due April 1992, 1993 and 1994. FCB, the mortgagee on the Litson property, has filed a foreclosure action against Litson.[6]

In short, the debtors have failed to demonstrate they will be able to make payments into their plan, as their plan is based on unreasonable assumptions, overstated income and understated expenses. And, although the debtors have about $90,000 on hand to immediately pay to the trustee on confirmation, that is insufficient, particularly since $65,000 of their funds is possibly cash collat-

---

5. In Exhibit AAC, the debtors had forgotten to reduce their projected crop income by the tenant share due their son, Leroy Zerr. Apparently realizing their error, debtors' counsel advised the Court and parties that Leroy Zerr would forego his share of the crops.

6. FCB has a pending motion for relief from stay to continue the foreclosure action against Litson and to add the debtors as party defendants. Marie Litson also has a motion for relief from stay pending.

eral belonging to Montezuma and not available to pay the other creditors.[7] The debtors have also failed to demonstrate that they will be able to pay the unsecured creditors as proposed, as they have failed to demonstrate that they will be able to sell or refinance the "Litson property" to pay the balance due the unsecured creditors in the fifth year of the plan. For the above reasons, the Court denies confirmation of the debtors' Amended Plan for failure to comply with 11 U.S.C. § 1225(a)(5) and (a)(6).

MOTION TO DISMISS

■ Chapter 12 was designed to provide an expedient, streamlined process to reorganize the family farmer. To that end, 11 U.S.C. § 1221 requires that the debtor file a plan within 90 days. Although there are undoubtedly cases in which the diligent debtor cannot file a plan in 90 days because of circumstances outside of the debtor's control, the general rule ought to be adhered to in most cases. The burden this places on the debtor is not untenable given the corresponding burdens the creditor bears in a Chapter 12 proceeding.

■ In this case, the creditors have been subjected to continuances and delay, while the debtors have failed to comply with deadlines to file schedules, to file a plan and to conduct discovery on claims issues. Now, 18 months later, there is no confirmed plan, the Court having denied confirmation of both plans the debtors have proposed. A dismissal is warranted when the debtors have failed to propose a confirmable plan after some period of delay, particularly when the court has denied confirmation on the basis of lack of feasibility. *See In re Ames,* 973 F.2d 849 (10th Cir.1992), *cert. denied Ames v. Sun-*

*dance State Bank,* —— U.S. ——, 113 S.Ct. 1261, 122 L.Ed.2d 658 (1993).

■ In the last 18 months, the creditors have been prejudiced as a result of the delay and as a result of the debtors' conduct. The secured creditors have received no payments, while their pending state court foreclosure actions have been held in abeyance. The unsecured and trade creditors have received nothing. The debtors have failed to pay real estate taxes on the property. And, at least $10,000 is missing from the cash collateral bank account for which the debtors cannot account.[8]

For all of these reasons, the Court finds that the debtors can be held almost entirely accountable for the delay in this case and that the debtors' conduct has resulted in substantial prejudice to the creditors. The motion of FCB to dismiss this case is granted. In light of this Court's ruling on FCB's motion to dismiss, it is unnecessary to rule on the other matters pending before the Court.

**IT IS THEREFORE ORDERED BY THE COURT** that confirmation of debtors' Amended Plan shall be DENIED for failure to comply with 11 U.S.C. § 1225(a)(5) and (a)(6).

**IT IS FURTHER ORDERED BY THE COURT** that FCB's Motion to Dismiss the debtors' Chapter 12 bankruptcy case shall be GRANTED pursuant to 11 U.S.C. § 1208(c)(1) and (c)(5).

This Memorandum shall constitute findings of fact and conclusions of law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure. A judgment based

---

7. Clement A.J. Zerr acknowledged that they could not afford to pay Montezuma as a secured creditor.

8. After the Court heard evidence that the debtors knew the cattle were claimed by Montezuma and knew that they were not supposed to spend the proceeds of any cattle, the Court announced from the bench that one ground for dismissal was violation of the Court's Order on Motion of Montezuma Credit Union Segregating Cash Collateral. After the evidence was completed, debtors' counsel stated that the $75,900 reflected on the debtors' 1992 tax return was not necessarily

from the sale of cattle, but may have been other items. Counsel proceeded to argue that the monies in the cash collateral account were from 1993 cattle sale and that there was no missing money. Aside from the fact that statements of counsel are not evidence the Court notes that Mr. Zerr testified that he had not sold any cattle since 1992, and he seemed to be under the impression that the monies in the cash collateral account were the same sales reflected on the 1992 tax return. Notably, the debtors' 1993 tax return does not reflect any sales of cattle or livestock in 1993.

on this ruling will be entered on a separate document as required by Rule 9021 of the Federal Rules of Bankruptcy Procedure and Rule 58 of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.