**In re Corinthian V. WINSTON, Debtor.**

**Corinthian V. Winston, Plaintiff,**

**v.**

**Chrysler Financial Corporation, Defendant.**

**Bankruptcy No. 99–10415DAS.**
**Adversary No. 99–0335.**

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

July 21, 1999.

---

Ronald G. McNeil, Philadelphia, PA, for debtor.

Steven P. Doughty, Lyons, Doughty & Veldhuis, P.C., Mt. Laurel, NJ, for Chrysler Financial Corp.

Virginia R. Powel, Ass't. U.S. Attorney, Philadelphia, PA, for Interested Party Social Security Administration.

Glen Rubin, Atlanta, GA, for Interested Creditor Chase Manhattan Mortgage Corp.

Edward Sparkman, Philadelphia, PA, trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant proceeding ("the Proceeding"), initiated by CORINTHIAN V. WINSTON ("the Debtor"), requires us to appropriately bifurcate the secured claim of CHRYSLER FINANCIAL CORPORATION ("Chrysler") in this case. Applying the principles set forth in *Associates Commercial Corp. v. Rash,* 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997), to value the Debtor's 1993 Dodge Caravan Minivan ("the Car"), we eschew adoption of a formula and fix the value at $6,000, somewhat more than the Debtor's lay testimony and somewhat less than Chrysler's evidence based solely on retail "book" value as of January 1999, rather than as of the

crucial subsequent date of confirmation. Applying *General Motors Acceptance Corp. v. Jones,* 999 F.2d 63, 71 (3d Cir. 1993), and finding no evidence in this record sufficient to undermine the presumption that the current market rate is equivalent to the contract rate of twenty (20%) percent, we must utilize that rate. We accordingly fix Chrysler's claim at $9537.00 and require the Debtor to promptly obtain confirmation of a plan which accepts that finding or face dismissal of her case.

## B. PROCEDURAL AND FACTUAL HISTORY

The Debtor filed the underlying individual Chapter 13 bankruptcy case on January 12, 1999. The Proceeding was filed on April 28, 1999. The confirmation hearing on this case was initially scheduled on June 10, 1999, and the Proceeding was initially set for trial on June 15, 1999. A previous feature of this case was a separate proceeding, filed on April 19, 1999, in which the Debtor sought to compel the Social Security Administration to restore her Supplemental Security Income disability benefits. That proceeding was dismissed in an Order of June 14, 1999, reported at 1999 WL 401691, principally on the ground

> that adverse actions on debtors' applications for public benefits are not barred by the presence of the automatic stay. *See In re Perkins,* 1995 WL 468204, at *2–*3 (Bankr.D.Idaho 1995); *In re Adkins,* 94 B.R. 703, 704 (Bankr.D.Or. 1988); and *In re Howell,* 4 B.R. 102, 104–05 (Bankr.M.D.Tenn.1980).

*Id.* at *2.

The confirmation hearing and the trial of the Proceeding were both continued by agreement to July 1, 1999, and then again to July 15, 1999. Despite an initial mutual request of the parties for a further continuance, noting that the Debtor appeared to be unable to decide even whether she wanted to keep the car or not until the Proceeding was resolved, and the delay which this uncertainty created to the confirmation process, we were reluctant to grant the further continuance request. The parties then proceeded to trial on July 15, 1999.

The Complaint challenges Chrysler's assertion of a secured claim of $15,280.42 against its secured interest in the Car. The Debtor was her only witness and Chrysler's only witness was Gary Comito, offered as somewhat of a valuation expert although he was employed by a Chrysler dealership and hence was not totally disinterested. In addition to testifying to the value of the Car, Comito also testified that the Debtor owed a balance of $13,745.11 on the Retail Installment Contract ("the Contract") under which she had purchased the Car, as a used vehicle, on May 21, 1996. Comito also stated that the Debtor had made no post-petition payments on the Car to Chrysler. We note that Chrysler filed a motion seeking relief from the automatic stay in order that it could repossess the Car on April 21, 1999; that this motion was reported as "settled" at a hearing of May 18, 1999; but that no stipulation setting forth the terms of the settlement has been filed. Neither party mentioned this motion or its resolution at the trial.

Comito, having never seen the Car, presented a copy of a page of the January 1999 NLADA Used Car Guide as his sole basis for valuation. The pertinent entries for 1993 Dodge Grand Caravans on this document are as follows:

| MODEL | TRADE–IN VALUE | LOAN VALUE | RETAIL VALUE |
|---|---|---|---|
| Grand Caravan | $5150 | $4650 | $6925 |
| Grand Caravan SE | $5900 | $5325 | $7750 |
| Grand Caravan LE | $7100 | $6450 | $9150 |
| Grand Caravan ES | $7350 | $6625 | $9350 |

Since Comito further testified that the vehicle identification number ("VIN") of the car identified it as a "Grand Caravan LE," he fixed the Car's value at $9150. Applying without further explanation or calculation what it claimed was the contract rate of interest, Chrysler asserted that the amount of its claim was $15,280.42.

The Contract indicates that the price of the Car was $13,000. A downpayment of $2000 was more than offset by the Debtor's agreement to produce a service contract for $2580. The annual percentage rate of the finance charge in the Contract was twenty (20%) percent, which Comito indicated was a typical rate for the financing of older vehicles like the Car.

The Debtor testified that she believed that the current value of the Car was only $4000 to $5000. She also stated that the Car bore a designation that it was a "Grand Caravan SE," irrespective of its VIN. She further noted that the Car had 33,000 miles on it when she bought it and about 73,000 miles on it today. Finally, she contended that the Car's value was reduced by engine problems which had not been successfully repaired despite her attempted invocation of her service contract and, in certain instances, her payments for service, and its peeling paint. The engine problem was described as a tendency of the Car to shut off and shake when idling or being driven at low speeds. The Debtor also claimed to have seen vehicles which appeared better than hers selling for $4000 to $5000 on the lot of the dealership where she constantly took the Car for repairs, although she failed to identify any of these vehicles by year or model.

Neither party expressed a desire to make a post-trial submission. Chrysler argued that *Rash* required that we accept Comito's figures. Most of the Debtor's attention was focused on a challenge of the Contract interest rate. She argued that we should disregard the Contract rate because the Contract, as exemplified by the seemingly ill-advised and ineffectual service contract included therein, was "unconscionable."

## C. DISCUSSION

In *Rash* the Court, interpreting 11 U.S.C. § 506(a), eliminated both a vehicle's foreclosure-value/wholesale value and a midpoint between wholesale and retail "book" value of the vehicle as formulas for fixing the value of motor vehicles in "cramdown" situations such as are presented by the Proceeding. 520 U.S. at 963–65, 117 S.Ct. at 1886. The most comprehensive statement of what the Court identified as an acceptable method of evaluating vehicles in this setting is set forth thusly, *id.* at 520 U.S. at 965 n. 6, 117 S.Ct. at 1886–87 n. 6:

> Our recognition that the replacement-value standard, not the foreclosure-value standard, governs in cram down cases leaves to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented. Whether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the nature of the property. We note, however, that replacement value, in this context, should not include certain items. For example, where the proper measure of the replacement value of a vehicle is its retail value, an adjustment to that value may be necessary. A creditor should not receive portions of the retail price, if any, that reflect the value of items the debtor does not receive when he retains his vehicle, items such as warranties, inventory storage, and reconditioning. *Cf.* [*In re Rash,*] 90 F.3d [1036,] at 1051–1052 [ (5th Cir.1996) (en banc) ]. Nor should the creditor gain from modifications to the property—*e.g.*, the addition of accessories to a vehicle—to which a creditor's lien would not extend under state law.

Since *Rash* was decided, many bankruptcy courts have struggled to formulize the foregoing passage. These efforts are apparently justified because "books" providing certain average values of motor vehicles are readily available and it is stated by these courts that, without a formula which allows them to utilize these "books," bankruptcy courts will be unable to efficiently resolve the presumably large number of unresolved vehicular cramdown

cases which are presented to them. In this quest for a formula, some courts have resorted to the wholesale/retail midpoint despite *Rash's* seeming express condemnation of this measurement formula. *See, e.g., In re Lyles,* 226 B.R. 854, 856 (Bankr. W.D.Tenn.1998); *In re Glueck,* 223 B.R. 514, 519–20 (Bankr.S.D.Ohio 1998); *In re Younger,* 216 B.R. 649, 657 (Bankr. W.D.Okla.1998); and *In re Franklin,* 213 B.R. 781, 782–83 (Bankr.N.D.Fla.1997). Other courts have utilized an unadjusted "book" retail value as a polestar. *See In re Jenkins,* 215 B.R. 689, 691–92 (Bankr. N.D.Tex.1997); and *In re Russell,* 211 B.R. 12, 14 (Bankr.E.D.N.C.1997). Yet another court has used the retail value, but adjusted it downward by a set reduction of five (5%) percent. *In re Renzelman,* 227 B.R. 740, 742 (Bankr.W.D.Mo.1998).

We have never, prior to the instant Proceeding, had occasion, neither before or after *Rash,* to fix the value of a motor vehicle for purposes of a Chapter 13 cramdown. We had always assumed, before and after *Rash,* that the valuation of the secured portion of property, in the context of a reorganization plan in which the debtor proposed to retain property, would be on a retail basis, without adjustment for potential foreclosure costs. *See In re 222 Liberty Associates,* 105 B.R. 798, 802–05 (Bankr.E.D.Pa.1989).

■ However, the low volume of such matters in our court and the language of the *Rash* decision convince us that establishment of a set formula for vehicle valuation in a cramdown bifurcation based upon "book" value is neither necessary nor, in light of the Court's statements in *Rash,* consistent with § 506(a). We therefore believe that we must be prepared to value vehicles on a case-by-case basis, depending on the evidence presented. While the parties may stipulate and witnesses may incorporate "book" values into their testimony, it is testimony based on the books' figures that control, not the books' figures in and of themselves. This sort of analysis appears consistent with the approach of the court in *In re McElroy,* 210 B.R. 833, 835–37 (Bankr.D.Or.1997). *See also In re McCutchen,* 224 B.R. 373, 374–75 (Bankr. E.D.Mich.1998) (applies *Rash* literally instead of attempting to reduce it to a formula). Here, our approach will therefore not be to devise a formula for vehicle valuation which is allegedly not inconsistent with *Rash,* but to value the Car on the basis of the evidence of record.

■ Comito's testimony provides us with the "book" retail value of a 1993 Dodge Grand Caravan LE as of January 1999. However, the critical time at which the Car must be evaluated is the date of confirmation of the plan. *See In re Jablonski,* 88 B.R. 652, 655 (E.D.Pa.1988); *222 Liberty Associates, supra,* 105 B.R. at 801; and *In re Blakey,* 76 B.R. 465, 468–69, *modified on other grounds,* 78 B.R. 435 (Bankr.E.D.Pa.1987). *But see In re Wood,* 190 B.R. 788 (Bankr.M.D.Pa.1996) (holds that date of valuation depends on a large number of factors, an analysis which appears overly complex to us). The pertinent date of valuation will therefore not be upon us until August 26, 1999, at the earliest, per our within order. There is no evidence as to how much the retail value of the Car would decrease between January and August, but we have little doubt that the Car is a constantly-depreciating asset and that, by the proper date of measurement, its value is likely to have decreased by several hundred dollars from the "book" figures submitted by Comito at trial.

We also must express a lack of certainty that the Car is in fact a model "LE" as opposed to an "SE." We appreciate Comito's reasonable reliance on the Car's VIN to make this identification. However, the Debtor's testimony that the Car bears the "SE" designation appears, if anything, more definitive. This issue is significant, because the valuation difference between the "LE" and "SE" models is $1400. *See* pages 169–170 *supra.*

■ The failure of Comito to inspect or even view the Car is critical, as it was in the court's assessment of valuation testimony in *McElroy, supra,* 210 B.R. at 837. Particularly in the case of an older vehicle, with notable mechanical and body deficiencies, a failure to inspect the vehicle renders valuation testimony of little practical significance. The cumulative effect of the erroneous pertinent valuation date, the possibly erroneous identity of the car's model, and the failure to factor in necessary repair costs appear clearly sufficient to deflate the book value relied upon by Comito to the $6000 range.

■ On the other hand, the Debtor's valuation testimony, while competent as the Car's owner, *see, e.g., Kinter v. United States,* 156 F.2d 5, 7 (3d Cir.1946); and *Blakey, supra,* 76 B.R. at 469, is not worth a great deal. She was unable to quantify the effect of the Car's mechanical and body problems upon its value. The mileage of the Car seems about average and is unlikely to adversely affect its value. The Debtor's testimony regarding sale prices of allegedly comparable vehicles was vague and unconvincing. At bottom, she presented nothing but a wishful guess regarding the Car's value. Nevertheless, given the obvious significant deficiencies in Comito's testimony, we set the bottom line of $6000 closer to her figure than that of Chrysler.

■ The final issue to be resolved in the measurement of Chrysler's claim is fixing the appropriate rate of the deferred interest payable to Chrysler on this $6000 balance, pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii). This precise issue, in the context of a cramdown of a secured motor vehicle, was at issue in *Jones, supra,* which is precedent binding on this court.

In *Jones* the court initially rejected the "cost of funds" approach for ascertaining the proper interest rate in favor of the "coerced loan" approach. 999 F.2d at 67–70. Next, the *Jones* court it held that the

appropriate "coerced loan" rate "is the interest rate that [the creditor] would charge, at the time of the effective date of the plans, for a loan of similar character, amount and duration." *Id.* at 70. Finally, with respect to the evidence of record which would be pertinent to fixing a "market rate," the court establishes the following "rule of practice:"

> In the absence of a stipulation regarding the creditor's current rate for a loan of similar character, amount and duration, we believe it would be appropriate for bankruptcy courts to accept a plan utilizing the contract rate if the creditor fails to come forward with persuasive evidence that its current rate is in excess of the contract rate. Conversely, utilizing the same rebuttable presumption approach, if a debtor proposes a plan with a rate less than the contract rate, it would be appropriate, in the absence of a stipulation, for a bankruptcy court to require the debtor to come forward with some evidence that the creditor's current rate is less than the contract rate (footnotes omitted).

*Id.* at 70–71.

Neither party has presented any evidence tending to establish that the appropriate "market rate" of a "coerced loan" secured by the Car should be in excess of or less than the twenty (20%) percent rate set forth in the Contract. The Debtor's suggestion that we can and should disregard the contractual rate because the Contract is, as a whole, "unconscionable" is not well taken. Unconscionability of the Contract has not been proven. *See generally Harris v. Green Tree Financial Corp.,* 1999 WL 445642, at *6–*8 (3d Cir. July 1, 1999). Moreover, even if the Contract were deemed unconscionable, the debtor has submitted no evidence as to what the correct "market rate" for financing the Car at present should be. *Cf. In re Harned,* 166 B.R. 255, 259–60 (Bankr. E.D.Pa.1994); and *In re Pagnotta,* 1993 WL 498197, at *1–*2 (Bankr.E.D.Pa. Nov. 30, 1993) (bankruptcy court is obliged to

utilize the contract rate in determining interest due on mortgage arrears in the absence of evidence regarding the market rate). Comito provided inconclusive but offsetting testimony that, in light of the advancement in the age of the Car from the date of the Contract to date, the current "market rate" might exceed that in the Contract.

In light of *Jones,* and the non-existence of the requisite evidence to the contrary to reduce it, this court perceives no alternative to utilization of the twenty (20%) percent Contract interest rate in the process of fixing the secured portion of Chrysler's claim. Calculating the interest on the $6000 claim over the presumed 60–month plan duration results in interest of $3537.00, or a computation of the secured portion of the claim at $9537.00.

### D. CONCLUSION

An order fixing the secured portion of Chrysler's claim at $9537.00 and requiring the Debtor to proceed towards confirmation on the basis of the figure or suffer dismissal of this case will be entered.

### ORDER

AND NOW, this 21st day of July, 1999, after a trial of the above-captioned proceeding ("the Proceeding") on July 15, 1999, in light of the arguments of counsel relative to the Proceeding and our review of the status of the underlying main case, it is hereby ORDERED AND DECREED as follows:

1. Judgement is entered in part in favor of CORINTHIAN V. WINSTON ("the Debtor") and against CHRYSLER FINANCIAL CORPORATION ("Chrysler").

2. The proof of claim of Chrysler is fixed at a secured claim in the amount of $9537.00 and an unsecured claim of the balance of the uncontested total amount of the claim of $15,280.42, or $5743.42.

3. The Debtor shall resolve all outstanding impediments to confirmation, either through filing and serving an Amended Plan consistent with this Order by July 30, 1999, or by some other means before the next listing, or this case will be dismissed.

4. Further hearings on Confirmation and the Trustee's Motion to Dismiss shall be held on

THURSDAY, AUGUST 26, 1999, AT 9:30 A.M. and shall be held in Bankruptcy Courtroom No. 1, Second Floor, 900 Market Street, Philadelphia, PA 19107.

5. No further continuances should be anticipated in the Confirmation hearing. This case may therefore be dismissed on August 26, 1999, if the Debtor's Plan cannot be confirmed on that date.