In re R.T. CRYSTIAN, Jr., Debtor.

R.T. CRYSTIAN, Jr., Movant,

v.

MELLON BANK, N.A., Respondent.

MELLON BANK, N.A., Movant,

v.

R.T. CRYSTIAN, Jr., Respondent.(Two Cases)

Bankruptcy No. 95–23157 JKF.
Motion Nos. GWS–4, OGB–3, OGB–5.

United States Bankruptcy Court,
W.D. Pennsylvania.

July 11, 1997.

See also 197 B.R. 803.

James F. Grenen, O'Keefe, Grenen & Birsic, P.C., Pittsburgh, PA, for Mellon Bank, N.A.

Gary W. Short, Pittsburgh, PA, for Debtor.

## MEMORANDUM OPINION [1]

JUDITH K. FITZGERALD, Bankruptcy Judge.

Before the court are (1) Debtor's objection to the claim of Mellon Bank, N.A. the first mortgagee; (2) Mellon's motion as an oversecured creditor pursuant to 11 U.S.C. § 506 for fees and expenses and Debtor's objection thereto; (3) Mellon's objections to confirmation of Debtor's chapter 11 plan; and (4) Mellon's motion to convert this chapter 11 to a chapter 7. For the reasons which follow we will (1) overrule Debtor's objection to Mellon's claim; (2) grant Mellon's § 506 motion and overrule Debtor's objection; (3) sustain Mellon's objections to plan confirmation; and (4) grant Mellon's motion to convert.

1. The court's jurisdiction was not at issue. This Memorandum Opinion constitutes our findings of fact and conclusions of law.

From the evidence adduced at trial we find as follows. Debtor is 50 years old. In 1969 he obtained a bachelor of science degree in liberal arts from Lincoln University. He has had some investment and banking training provided by his employer, Mellon Bank. He has worked for Mellon since 1969 in various capacities and now is an assistant vice president in the Portfolio Management Department. He has held this position for 15 years. His duties include borrowing money on a short-term basis and pricing Mellon's liabilities to raise wholesale money for Mellon. His current income is $54,900 per year.

Debtor filed this chapter 11 on August 18, 1995, to save his house from Mellon's pending foreclosure action and filed his plan approximately seven weeks later. Mellon objected to the plan on the ground that its mortgage was not modifiable. We held that the mortgage is modifiable pursuant to 11 U.S.C. § 1123(b)(5) because it is secured by a security interest in property other than Debtor's principal residence. *See* Memorandum Opinion of July 9, 1996. The question before us now is whether the plan is feasible, fair and equitable with respect to Mellon. An evidentiary hearing was held to decide whether the plan, with the proposed modification to the mortgage, is confirmable.[2] The testimony and evidence established that Debtor's income is insufficient to fund the plan, that Debtor cannot propose a feasible plan within a reasonable period of time, and that the proposed payments on Debtor's estimate of Mellon's claim are insufficient to provide Mellon with deferred cash payments totaling at least the allowed amount of such claim as required by 11 U.S.C. § 1129(b)(2)(A)(i)(II), and does not amortize Mellon's mortgage fairly and equitably.

At trial, Debtor argued that the plan is "reasonably feasible", although there is no guarantee of performance. Debtor contends

that recent reductions in his living expenses will enable him to make the plan payments. He also contends that the plan is fair and equitable because he offers an interest rate of 8.25 percent which is above the market rate. Further, Debtor asserts that the proposed 17 year repayment term is within Mellon's lending practices and that Mellon would make the same or a similar loan and must do so under *GMAC v. Jones*, 999 F.2d 63 (3d Cir.1993). At trial, and in post-trial submissions, Debtor insists that he has reduced his monthly expenses and will continue to do so in order to afford the plan payments. However, the monthly financial reports filed with the court through February 1997 do not support Debtor's assertion that he can afford the payments. In February of 1997, in fact, Debtor had a *negative* cash flow of $1,653.46. Throughout this bankruptcy there have been several months in which Debtor had negative cash flow.

I. *PLAN CONFIRMATION ISSUES*

A. *Debtor's Objection to Mellon's Claim and to Mellon's § 506 Application*

Debtor's Third Amendment to Plan of Reorganization (Third Amended Plan) is based on the assumption that Mellon's claim is $95,-000.[3] At trial Mellon established that Debtor owes $117,505.33, plus any additional fees and expenses allowed pursuant to 11 U.S.C. § 506(b). Debtor propounds that Mellon's claim is $95,000, alleging that (i) the amount stated in the mortgage foreclosure action was $91,000; (ii) Mellon accelerated the debt at that time and, therefore, the interest rate applied by Mellon in its computation of its claim should have been the Pennsylvania legal rate of six percent, rather than the contract rate of 8.25 percent; and (iii) Mellon's claim for attorney's fees is excessive and, therefore, the claim must be reduced by the amount of excessive fees. Debtor's conten-

---

**2.** An evidentiary hearing was held on December 10, 1996, and concluded on February 3, 1997. Closing arguments were held on February 4, 1997. The hearing in the § 506 application was held on April 11, 1997. Dollar Bank, the second mortgagee, joined in Mellon's motion to convert.

**3.** At one point during the trial Debtor asserted that he owes only $83,000 because on the date the bankruptcy was filed Mellon's claim was only

$87,000, $10,000 worth of interest accrued during the chapter 11, and Debtor has paid approximately $15,000 through the chapter 11, leaving a balance of $83,000. The credible evidence did not support this assertion. Furthermore, the Third Amended Plan, filed approximately one month before trial commenced, is based on the assumption that Mellon's claim is $95,000.

tions were not supported by the credible evidence. The complaint in mortgage foreclosure was filed on June 23, 1995, and alleged that the amount due at that time was $91,000. However, the complaint, is not evidence of the amount of the claim as of the date the bankruptcy was filed or on the date of trial.[4]

Robert R. French, assistant banking officer and supervisor of Mellon's Foreclosure and REC Section of the Retail Collection Division, testified that $117,505.33 is due and owing to Mellon, after deducting payments, calculated as follows:

| | |
|---|---|
| principal | $74,611.53 |
| interest through 1/29/97 | 10,218.25 |
| inspection fees | 162.75 |
| escrow deficiency through 1/29/97 | 4,993.84 |
| attorneys' fees as of 1/29/97 | 23,330.50 |
| legal costs as of 1/29/97 | 1,647.96 |
| expert fees | 2,540.50 |
| TOTAL: | $117,505.33 |

*See* Exhibit HH. This amount is exclusive of interest, increases in escrow deficiency, late charges and additional attorneys' fees after January 29, 1997. French testified that no late charges have accrued or been added to the calculation since November of 1995 when this court entered an adequate protection order. That order required Debtor to pay Mellon $953.60 per month. Debtor also was required to maintain insurance on the property for a value of at least $125,000. The $953.60 per month was based in part on the equity in the property over and above Mellon's claim. It is about $800 per month less than the $1,710 required by the contract which included escrow payments for taxes and insurance. The adequate protection payment excluded taxes and insurance. Debtor has been paying the insurance himself and Mellon has been paying the taxes for which it has not been reimbursed. We credit Mr. French's testimony and find Debtor's

challenge to the amount of Mellon's claim on this ground to be without merit.

We also find Debtor's argument that Mellon accelerated the obligation to be without merit. At trial, Debtor argued that the amount stated in Mellon's complaint in foreclosure, approximately $91,000, represented the accelerated amount and, therefore, the Pennsylvania judgment, rate of interest (six percent) should apply. The Housing Finance Agency Law, 35 P.S. § 1680.102 *et seq.*, distinguishes between acceleration of the obligation due on the note and foreclosure actions instituted on the mortgage. 35 P.S. § 1680.402c. Mortgagees are forbidden either to accelerate or to commence foreclosure proceedings until notice regarding the Homeowner's Emergency Mortgage Assistance Program is given. *Id.* Mellon sent such a notice to Debtor, dated April 11, 1995, stating its intention to accelerate or foreclose if certain conditions were not met within 30 days.[5] *See* Exhibit 7. On June 30, 1995, Mellon instituted a mortgage foreclosure action, an *in rem* proceeding. Mellon did not institute an *in personam* action on the Note. Thus, there is insufficient credible evidence to establish that Mellon accelerated the obligation due on the Note.

Even if acceleration had occurred, we find Debtor's argument that the Pennsylvania judgment rate of interest, six percent, must be charged until the plan is confirmed to be without merit. In *Wright v. Hanna,* 210 Pa. 349, 59 A. 1097 (1904), the court stated that the contract rate of interest applies until the debt matures. The court also stated that the words "until paid" in a note refer to the maturity of the note. Although this statement was made with respect to contract rates of interest of less than six percent, the principle has been applied in subsequent

---

4. The complaint is Exhibit 8. Only the caption, paragraph 10 and the "wherefore" clause were admitted into evidence. Paragraph 10 itemizes amounts due when the complaint was filed (principal, attorney's fees, costs, title search, interest, late charges and escrow deficiency to June 23, 1995). The "wherefore" clause demands judgment for the total ($91,181.56) plus interest at $17.99 per day from June 23, 1995, and additional late charges and costs, including any escrow deficiency.

5. The Note which the 1986 mortgage secures provides that

   If any monthly installment ... is not paid when due and remains unpaid after a date specified by a notice to Borrower, the entire principal amount outstanding and accrued interest thereon shall at once become due and payable at the option of the Note holder ...
   *See* Exhibit 15.

cases where the contract rate exceeds six percent.

The maturity date under the Note in this case is December 1, 2001. In *In re Dilts*, 143 B.R. 644 (Bankr.W.D.Pa.1992), the court concluded that the language "until paid" in a note relates to the date the obligation matures, as stated in the note. In *In re Presque Isle Apartments, L.P.*, 112 B.R. 744, 747 (Bankr.W.D.Pa.1990), the court held that, if a default rate is not expressed in the contract, the contract rate applies when it appears unlikely under the circumstances that the parties intended a lower rate. There is no evidence in this case that the parties intended less than the contract rate to apply.[6] In fact, the Note provides for an increase in the interest rate to 8.75 percent should Debtor's employment by Mellon terminate.

We have found no authority, and Debtor has offered none, for the proposition that a notice of intent to accelerate or the filing of a foreclosure action is the equivalent of acceleration of the maturity of the note. We conclude that mere issuance of an intent to accelerate the obligation in the future if certain conditions are not met is not the equivalent of actual acceleration of the obligation. Accordingly, we find that the judgment rate of interest does not apply and that the interest rate charged by Mellon in computing its claim is proper.

■ Debtor's objection to Mellon's fee claim of $30,965 [7] is based on the argument

that, since Debtor's plan, as amended, provides for full payment to Mellon, Mellon acted irresponsibly in objecting to the plan and otherwise participating in this case. We find that Mellon's conduct in this case was justified and the fees incurred in order to protect its claim are reasonable and necessary.

The issue is whether attorney's fees claimed by Mellon are necessary and, if so, what a reasonable amount should be. Mellon claims $30,965 in attorney's fees of which $23,330.50 is included in the $117,505.33 itemization; $1,900.53 in expenses of which $1,647.96 is included in the itemization. If the fees and costs are allowed in full Mellon's total allowed secured claim will be $125,391.90. The determination of the amount of attorney's fees will determine the total amount of Mellon's claim. Debtor objects to most of the actions taken by Mellon resulting in the accrual of attorney's fees, contending that they were unnecessary and, therefore, should not be compensated. Debtor first contends that Mellon's fees were not incurred in pursuit of a mortgage foreclosure and are not provided for in the note or mortgage.[8] We disagree with Debtor's construction of the Note and mortgage.

The Note provides: "If suit is brought to collect this Note, the Note holder shall be entitled to collect all reasonable costs and expenses of suit, including, but not limited to, reasonable attorney's fees."[9] Exhibit 6. Paragraph 7 of the 1986 mortgage provides:

---

6. The court in *Presque Isle* also stated that when a judgment in foreclosure is obtained, the legal rate of interest applies unless either the note or the mortgage evidences "a clear intent to continue the contractual rate of interest postjudgment". 112 B.R. at 747. If the lender's claim is based only on the note, the lender is entitled to the contract rate of interest. In this case there is no judgment against Debtor but the mortgage provides, in paragraph 24, that the contract rate under the Note will apply after entry of judgment. Under the facts of this case, if we were to credit Debtor's theory, the interest rates would be: contract rate (8.25%) while the note was not in default; Pennsylvania judgment rate (6.00%) from the date of alleged acceleration until the date of judgment; contract rate (8.25%) after entry of judgment. Such an anomaly is not warranted on the facts of this case and the contract rate applies throughout.

7. Mellon also claims expenses of $1,900.53 that is not included in the $30,965 fee amount. Debt-

or's objection includes a reference to the fees *and* the expenses sought by Mellon but no objection to any specific expense is addressed. We find the expenses charged to be reasonable and necessary. Therefore, all expenses in the § 506 application will be allowed.

8. Debtor also asserts that Mellon's fees were not caused by Debtor's breach of his mortgage obligations and that Mellon can recover only those fees resulting from such a breach. Debtor's failure to make payments is a breach. *See* Exhibit 6, Note; *see also id.* at Mortgage, ¶ 7.

9. Paragraph 19 provides that, upon acceleration of the debt:

If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial

If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, ...), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Exhibit 6.

Paragraph 18 of the same instrument provides:

If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued.... [on condition] that Borrower ... (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorney's fees....

Exhibit 6.

It is clear from the terms of the Note and mortgage that Mellon is entitled to attorney's fees and expenses incurred to protect its interest after Debtor's default or in the event that legal action is taken to collect the debt or foreclose on the property. Mellon instituted a mortgage foreclosure action before

the bankruptcy was filed because Debtor was over $9,000 in arrears. Reasonable fees for foreclosure proceedings are allowed under the mortgage. The fee application and other submissions by Mellon establish that counsel charges a flat fee for certain services, including mortgage foreclosure actions, when there is no contest. If the matter becomes contested, an hourly rate is charged. Mellon filed a foreclosure action but was prevented from pursuing it by the filing of the bankruptcy. In light of Debtor's significant default on his obligations under the mortgage, Mellon was entitled to pursue its remedies and the flat fee charged by its counsel for an uncontested foreclosure action is reasonable.

Debtor contends that the actions Mellon took during the bankruptcy were unnecessary. Paragraph 7 of the mortgage permits Mellon to "do and pay for whatever is necessary to protect ... Lender's rights in the Property." Exhibit 6 at ¶ 7. Debtor opines that because the original plan proposed to pay Mellon in full, Mellon should not have objected to the plan and its fees in this regard should not be allowed. We find that Mellon was justified in filing objections to the original plan because it proposed to substantially modify Mellon's claim rendering the mortgage a 40–year obligation. The evidence and testimony established that Mellon would not make a loan such as that proposed by Debtor in the plan. Although we eventually determined that this mortgage was modifiable because it included a security interest in property other than Debtor's principal residence, the issue was genuine and the facts of this case concerning the additional security [10] were unusual enough to require extensive research, briefing, and court time. In addition, this trial concerned the legitimate issues of whether the proposed treatment of Mellon's claim under the amended plan is fair and equitable and whether the plan as a whole is feasible. Furthermore, Debtor objected to Mellon's claim, requiring Mellon to respond in order to protect its claim. Thus,

proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 19, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by applicable law.

Exhibit 6.

10. The additional security was a security interest taken by Mellon before the mortgage date in Debtor's checking account.

Mellon's objection to the plan and its defense of Debtor's objection to its claim were reasonable and necessary under the circumstances. The fees and expenses charged were also reasonable.

Mellon also incurred fees in an effort to obtain relief from stay. Mellon's action was necessitated by Debtor's failure to pay the mortgage postpetition. The fees incurred in connection with this and the other activities of Mellon in this case were reasonable and necessary and will be allowed in full.[11]

The only questionable entry in Mellon's fee petition is 2.4 hours spent researching the effective date of § 1123(b)(5). This provision permits modification of residential mortgages when the secured party has collateral in addition to the real estate used as the debtor's principal residence. However, the fee charged was $50 per hour. We consider the charge to be reasonable and will allow it. For the foregoing reasons, Debtor's objection to Mellon's § 506(b)claim is overruled.

B. *Mellon's Objection to the Plan: Is the Plan Fair and Equitable as to Mellon? Is it Feasible?*

Pursuant to the terms of the December 1, 1986, Note, principal and interest (at the rate of 8.25 percent per year) are due and payable on December 1, 2001. On the date of filing of the bankruptcy petition, monthly payments were $1,710 [12] (principal and interest of $1,241.78 plus escrow of $468.22). Debtor's second mortgage payment to Dollar Bank is $504 per month. Monthly mortgage payments totaled $2,214 which, prepetition, Debtor had attempted to keep current by using his credit cards. He was unsuccessful and defaulted on his obligations.

Mellon established at trial that it mailed preforeclosure notices to Debtor and Carol Crystian [13] on April 11, 1995, whereupon Debtor applied for a Homeowners' Emergency Mortgage Assistance Loan. Frederick Reed, the Director of the Pennsylvania Homeowner's Emergency Mortgage Housing Assistance Program, was called as a witness by Mellon and testified regarding the mortgage assistance application process and why Debtor was denied assistance. He testified that the application process for emergency assistance includes gathering information about the applicant's income, family composition, amount of mortgages and their balances, assets and debts. Living expenses also are analyzed and these include food, transportation, insurance, medical expenses, and clothing. Total net monthly income is compared to housing and living expenses and installment debt obligations. Reed testified that the Agency's review established that. Debtor had no reasonable prospect of resuming full mortgage payments in 36 months and paying on maturity because his monthly income of $3,165 was insufficient to cover expenses of $5,139.24 a month (housing expense of $2,613.24, living expenses of $536, utilities of $399, and installment debt of $1,990).[14]

The loan was denied on June 12, 1995, on the grounds that (1) Debtor had no reasonable prospect of resuming full mortgage payments within 36 months and paying until maturity because he had insufficient income and his expenses exceeded his income; (2) Debtor had not been able to maintain mortgage payments for the three years prior to application; and (3) Debtor's finances were overextended. *See also* Exhibit D to Brief of

11. We also note that Debtor's financial reports establish that he either had negative net cash flow or his cash flow was insufficient to meet the monthly mortgage obligation of $1,710. *See* Exhibits A and B, Financial Reports for September and October, 1995. In November of 1995, Debtor made his first adequate protection payment of $953.60 which resulted in negative cash flow for the month. Mellon's motion was a reasonable action under the circumstances.

12. The original loan was for $126,000 from Mellon on February 20, 1985, pursuant to a 30 year term loan secured by a first position mortgage. On December 1, 1986, the loan was refinanced

for $128,000 at an interest rate of 8.25 percent for 15 years, again secured by a first position mortgage. The total monthly mortgage payment, including principal and interest, was $1,241.78.

13. Carol Crystian filed a chapter 7 case at Bankruptcy Number 92–20871 and received a discharge shortly thereafter. Mellon obtained a foreclosure judgment against her.

14. Based on information provided to the Agency by Debtor, his monthly utility costs were calculated to be $399. Debtor testified at trial that his utility costs were $205.77.

Mellon Bank, N.A., in Response to Objection to Claim, Docket Entry No. 108. Thereafter, on June 30, 1995, Mellon filed a complaint in mortgage foreclosure in the Court of Common Pleas of Allegheny County and, on August 18, 1995, Debtor filed this chapter 11. At that time, mortgage payments for December 1, 1994, through August 1, 1995, were owed.[15]

Debtor concedes that this plan is a difficult one for him to fund over the next 16.7 years.[16] Thus, estimates of his future living expenses and income tax liabilities are crucial to determining whether this plan is feasible. The testimony was conflicting. Debtor's Exhibit 29, summarized in Exhibit 41, reflects his monthly living expenses, as represented by bank disbursement records, from July, 1996, through October, 1996. Exhibits 29, 41 and 41A are summaries of monthly disbursements from Debtor's bank account. Exhibit 41 categorizes expenses as follows: food, transportation, utilities, home maintenance, recreation, laundry, clothing, and miscellaneous. This exhibit, as well as Exhibit 41A[17] which includes additional months' expenses, do not include mortgage payments, automobile or home insurance, legal fees, YMCA membership fees, and cable television. The exhibits also do not include expenses for at least one of Debtor's children, Rhyan.[18] Debtor testified that he considered these excluded items to be non-recurring expenses inasmuch as (1) mortgage and homeowners insurance payments will be included in his plan payments; (2) Debtor will sell his car, if the plan is confirmed, and will not have an on-going auto insurance expense; (3) Debtor will give up his YMCA membership and (4) the subscription to cable television has been canceled.

Debtor calculated that his average monthly utility costs total $205.77. However, based on the trial testimony and exhibits, we find that the monthly average is actually $241.06. The following exhibits were admitted:

*Electric.* Exhibit 25, Duquesne Light Company Residential Billing Histories shows that Debtor's electric bill ranged from $52.41 in May of 1996 to a high of $75.44 in July and September of 1996. Debtor calculated the average of all charges which is $64.89.

*Gas.* Equitable Gas summary, Exhibit 26, reflects gas bills for the period between September 29, 1995, and September 4, 1996. Debtor again calculated the average and it is $83.98. We note, however, that the charges for actual usage during the winter months exceed $150. Furthermore, no payments are shown for the postpetition months of January, March, and July of 1996.

*Telephone.* Debtor submitted a page from each telephone bill from August, 1995, to July, 1996. Exhibit 27. The "Totals" column of Debtor's telephone bill ranged from $19.19 to $96.91 with 7 of the 12 months exceeding $40. All but two reflect past due amounts. The average amount is $56.29 according to the court's calculations. Debtor testified that he makes few long distance calls and Exhibit 27 supports his statement.

*Alcosan.* Exhibit 28 is a Letter dated October 3, 1996, from Alcosan (Allegheny County Sanitary Authority). Of five entries, four reflect delinquent payments between August, 1995, and May, 1996, and the fifth is an unpaid charge from August, 1996. The bills ranged from $22.03 to $32.70 for each three month period. Debtor testified that he compared Exhibit 28 with his bills and the aver-

---

15. Postpetition, Debtor did not pay anything towards Mellon's mortgage until Mellon sought relief from stay and this court entered an adequate protection order requiring him to pay $953.60. Debtor also failed to pay anything to Dollar Bank, the second mortgagee, for the first 11 months of this case. Debtor resumed payments only after Dollar Bank sought redress in this court.

16. As a general rule, most other creditors will be paid over six years.

17. This exhibit was admitted on the second day of trial over Mellon's objections. Mellon was

provided an opportunity to address any unfair surprise that may have resulted.

18. In addition to the three children he and his ex-wife had, Debtor has another child, Rhyan. Debtor testified that he is not under a court order to support Rhyan but pays what he can, when he can, towards the child's support. Rhyan lived with him for some time in the past but, as of the trial date, was living with the mother. The court ordered support is for his and Carol Crystian's youngest child, Jasmine.

age charge is $8.53. Debtor admitted that he has been delinquent with all Alcosan bills postpetition.

*Water.* Exhibit 24, entitled "Customer Inquiry Pay Plan Account" concerns the water bills from February, 1995, to September, 1996. Debtor calculated that the charges average $27.37.[19] He also testified that one water bill of $216 was abnormally high because he was on a payment plan due to delinquencies.[20] Through this 19 month period, there were only six months when a finance charge did not accrue: March, 1995, July, 1995, October, 1995, December, 1995, March, 1996, and May, 1996.

*Homeowner's Insurance.* The evidence concerning Debtor's homeowner's insurance established that the basic premium is $603 per year, $684 if payments are made quarterly. At $603 this amounts to a little over $50 per month. The testimony established that Debtor usually made quarterly payments. However, giving Debtor the benefit of the doubt, we use the lower figure of $50.

*Real Estate Taxes.* Concerning real estate taxes, Exhibit 22 shows county taxes from 1993 to 1996, with the amount decreasing from $1,250.17 in 1993 to $863.13 in 1996. The exhibit also shows city and school taxes for 1995 and 1996 of $1,716.25 (city) and $2,044.79 (school) in each year. The total for 1996 is $4,624.17 or $385.35 each month.

Robert R. French, manager of Mellon's foreclosure and REO division for Mellon's retail financial services, testified concerning the escrow deficiency in this case. Exhibit 1 to Exhibit O [21] contains annual statements of Debtor's mortgage account for the years 1989 through 1995. These statements are prepared and maintained in the ordinary course of Mellon's business and reflect all transactions concerning the mortgage for each year, including, *inter alia,* the monthly payment, the taxes paid, and the interest paid. The 1995 statement shows that the escrow impound amount for taxes and insurance that was part of the monthly payment was $468.22. In 1996, that amount was $396.48 per month. The amount was reduced in 1996 because Debtor paid the hazard insurance himself that year. Debtor did not pay the taxes, however. *See* Exhibit 2 to Exhibit O, Annual Escrow Account Disclosure Statement Projection dated July 25, 1996. At the time of trial, the escrow account should have been zero ($0.00) because the taxes had just been paid. However, as of April, 1996, the escrow deficiency was <$4,716.72$ because the adequate protection payments Debtor was making were insufficient to cover the taxes which Mellon paid. The testimony also established that the proposed plan payments are not sufficient to amortize the principal, pay the interest, and cover the tax payments.

The monthly average [22] of all utility ($241.06), homeowner's insurance and real estate taxes totals $676.41. Debtor calculated his food, transportation, clothing, home maintenance, recreation, laundry, utilities, and "miscellaneous" expenses for the last six months before trial as $678.91. *See* Exhibits 41 and 41A. We will use Debtor's figure. In addition, Debtor proposes plan payments of $713.70 per month to Mellon for the first six years.[23] Thus the total monthly amount is $1,392.61. This figure does not include medical expense, court ordered child sup-

19. Our calculations show that for the 18 month period between March of 1995 and August of 1996 the average charge is $31. Because the difference is minimal we will adopt Debtor's figure for purposes of this opinion.

20. Debtor's Schedule D, Amendment to Creditors Holding Secured Claims, lists a 1992 lien of $178.39 for water service. It also lists a lien in the amount of $599.22 for the years 1991 to 1993. For sewer service at the residence from January of 1994 to October of 1995 Debtor lists an obligation of $287.13. For water service from January of 1993 to August of 1995 Debtor lists a debt of $1,244.77.

21. Exhibit O was not admitted over a hearsay objection. French testified concerning Exhibits 1 and 2 which were attached to Exhibit O and those attachments were admitted into evidence.

22. Debtor's numbers were used for electric, gas, Alcosan, and water bills. The court calculated the average monthly telephone, homeowner's insurance, and tax bills from the evidence introduced at trial.

23. That amount will increase after six years and again four years later. *See* Third Amended Plan.

port for Jasmine [24] of $443 per month, expenses for Rhyan,[25] homeowner's insurance, real estate taxes or the second mortgage of Dollar Bank.[26] Adding together everything Debtor pays for or is required to pay through the plan establishes that he needs $3,040.86 per month, plus additional funds to cover plan payments for the claim of the City of Pittsburgh, the Internal Revenue Service, unsecured creditors, his medical expenses, expenses for Rhyan, and miscellaneous expenses.

At trial, Debtor testified about his recent changes in spending habits. Lawrence J. Sipos, a certified public accountant called on behalf of Mellon, testified that Debtor's recent change in spending habits was not a reliable indicator of actual or future expenses. We agree. Debtor's Exhibits A through N are cash receipt and disbursement statements for September, 1995, through October, 1996. These provide a more comprehensive picture of Debtor's financial condition throughout the course of this case than do the bank disbursement records relied on by Debtor. The cash receipt and disbursement statements show that in November of 1995 and January, February, May, August, and October of 1996 Debtor had negative cash flow.[27] Charges for utilities were over $200 each month except in two months where they were approximately $100, one month in which they were $704.41 and another in which they were over $550.

John P. Donovan, an attorney and certified public accountant, testified on behalf of Debtor. He prepared Exhibit 40, Projected Statement of Cash Flows and Annual Plan Payment Schedule [28]. Donovan testified that, on instructions from Debtor's counsel, he assumed that Debtor's monthly living expenses were $800 based on Debtor's Affidavit in Response to [Mellon's] Motion to Convert. However, in preparing his report, Donovan accepted the $800 figure without analyzing or verifying expenses or looking at specific transactions. He discussed Debtor's transportation costs with Debtor's counsel, but did not analyze them; nor did he analyze the monthly financial reports Debtor filed in this case. Donovan did perform an analysis of taxes and mortgage costs.

Debtor's Affidavit in Response to Motion to Convert included bank account disbursement records and cash receipt and disbursement records for August, 1995, through July, 1996, reflecting disbursements of between $1,300 and $3,600 per month (once he started making adequate protection payments to the mortgagees).[29] Donovan testified that, if Debtor's monthly living expenses were $1,000, Debtor could not make the proposed plan payments. Living expenses are not the only consideration, however. A realistic picture of Debtor's prospects for successfully reorganizing must account for all disbursements he will be required to make. His actual expenses, as reflected in Exhibits K through N, monthly cash receipts and disbursement statements for the months of July through October 1996, were never less than $1,000. In fact, the lowest amount was $1,328.43 in September of 1996, a month in which the only adequate protection payment

---

24. Jasmine is 12 years old. Thus, this expense is likely to continue for at least six more years.

25. The plan provides that the first 144 payments to Mellon, made twice a month, will be in the amount of $356.85. This amounts to $713.70 per month for six years.

26. On the date the bankruptcy was filed, Debtor owed Dollar Bank $33,689.20. The plan provides at ¶ 4.02 that Dollar Bank shall be paid 100 percent of its claim at ten percent interest in 180 consecutive monthly payments. Payments are to commence 30 days after the plan confirmation date. *See* Plan of Reorganization, Docket Entry No 15. The regular monthly payment under the mortgage with Dollar Bank is $504. Pursuant to court order, Debtor has been making adequate protection payments of approximately $390.

27. The range was <$144.46$ (February, 1996) to <$1,057.40$ (October, 1996).

28. The supplement to this exhibit was not admitted into evidence.

29. Debtor's total expense for July of 1996 through October of 1996 are between $1,800 and $4,000 each month. Exhibit 41A added monthly expenses for November and December 1996 and reflects an average of $678.91. The exhibit excluded various expenses, thereby not providing an accurate picture of the total that will be required monthly. Furthermore, Exhibit 41 is only a record of bank account disbursements. It does not include any information regarding positive or negative cash flow.

made was that of $393.42 to Dollar Bank. Debtor's other expenses for the month were $938, close to the $1,000 limit Donovan described.

We stated, *supra*, that with living expenses of $678.91 Debtor could not meet all payments he will be required to make if this plan is confirmed. Using Donovan's assumption that living expenses would be $800 merely worsens the situation. Furthermore, Donovan's assumption is not well founded. It is not based on an independent evaluation of Debtor's expenses and he did not testify regarding *all* of Debtor's expenses. The evidence established that Donovan's estimate of $800 is less than half of Debtor's total actual historical expenses, as reflected on cash receipts and disbursement records for the last six months before trial, Exhibits K through N. Debtor's monthly bank disbursement records, Exhibit 29 (and Exhibits 41 and 41A), also show that his total expenses each month are greater than those calculated by Debtor or Donovan. These exhibits do not reflect the fact of Debtor's frequent negative cash flow.

Donovan also analyzed Debtor's income tax liability. In his calculations, he assumed (1) that Debtor had one child living with him, (2) that he could claim the child as a dependent on his tax return, (3) that he could claim head of household status, (4) that Debtor would experience annual wage and expense increases of two percent a year, (5) that Mellon's debt was $95,000, (6) that Mellon would be repaid at an interest rate of 8.25 percent. He concluded that withholding taxes would be less if Debtor resubmitted a W–4 because he currently is being over-withheld. He assumed that Debtor could claim head of household status regarding Rhyan but this assumption was not supported by the credi-

ble evidence at trial because Debtor lives alone and there was no evidence that he pays more than 50 percent of Rhyan's annual expenses.[30] Donovan testified that one can claim head of household status as long as a dependent is in residence, even if the dependent is not claimed on the tax return. Here, however, Debtor's own testimony was clear that Rhyan does not reside with him. Lawrence J. Sipos testified that Rhyan would not qualify as a dependent under the facts of this case, even if he lived with Debtor because Debtor does not contribute more than one-half of his support for the year. We find that Debtor is not likely to succeed on any claim to head of household status and, therefore, any advantages associated with that status will not accrue to him.

Lawrence J. Sipos was qualified as an expert on valuation. Sipos' calculations differed from Donovan's in several material respects. Sipos based income tax calculations on Debtor's actual, current tax status as a "single" filer, whereas Donovan based his on Debtor's theoretical status as head of household. Sipos testified, and we agree, that Debtor has not established eligibility to claim head of household status because he does not have a dependent living in his principal place of abode for more than six months of the year. Even if Debtor could claim that status,[31] however, Sipos testified that Debtor would have to add $13 a day (approximately $390 a month, $13 × 30 days)[32] to his budget for child care expenses which would exceed the tax savings of $146 per month he would realize if he changed his tax filing status. Even without this additional child care expense, the $146 per month savings would not result in a positive cash flow for Debtor until the year 2004. Debtor testified that his ex-

---

30. Lawrence Sipos, CPA, testified that dependent status usually arises from providing more than one-half of the dependent's support for the year. There are two exceptions: (1) when the parties agree that one shall claim the dependent or (2) when payment of a certain percentage of the child's support is made, as long as all parties provide over a certain percentage of the support. Neither exception was supported by the evidence at trial.

31. We note that Debtor submitted a copy of 1996 federal income tax return with his monthly oper-

ating report for April, 1997 (Docket Entry 123). Although he claimed head of household status, asserting that Rhyan lived with him for nine months in 1996, he still owed and paid taxes in the amount of $572.64 for 1996, over and above the amounts withheld from his wages.

32. Sipos calculated child care costs as $8,239 per year or $22 per day. Fifty-eight percent of the cost of child care is food and clothing. Fifty-eight percent of $22 is $13. Thus, Debtor's average food and clothing cost for Rhyan would be $13 per day if Rhyan lived with Debtor.

penses will be further reduced if the plan is confirmed because in that event he will sell his automobile.[33] Sipos pointed out, however, that Debtor still will incur transportation expenses of at least $40, the price of a monthly bus pass.

Sipos assumed a wage increase of 2.8 percent, although the testimony was that Mellon currently is under a wage freeze. He testified that the Consumer Price Index—Urban (CPIU), as published by Ibbotson and Associates, establishes a 3.4 percent increase in expenses based on historical data.[34] Sipos averaged Debtor's actual monthly expenses for a 14 month period as reported by Debtor in his monthly financial reports, excluding the mortgage and attorney's fees. He testified that Debtor's expenses have been approximately $1,200 which is $400 more than the amount assumed by Donovan. Even with Debtor's increased gross monthly earnings of $4,600 (net income of approximately $3,000[35], see Exhibit 3A), Debtor will not enjoy a positive cash flow. Sipos also testified that even if Debtor can make the administrative payments of $18,995 in full 90 days after plan confirmation and the unsecured claim payments of 20 percent on the Plan Effective Date[36], as proposed by the plan, Debtor will not be able to make on-going plan payments based on his income and historical expenses. Donovan's more modest estimate of a wage increase of only two percent, rather than Sipos' of 2.8 percent, does not change the result because Donovan did not account for increased expenses on the basis of the CPIU.

Sipos testified that Exhibits 41 and 41A, representing Debtor's record of his expenses for the most recent six month period, as reflected by the monthly bank disbursements statements filed in this case, may not be representative of Debtor's true expenses. Some expenses, he stated, could be cyclical or incurred and not yet paid, which cannot be determined from these exhibits. At least a 12 month overview is necessary. Sipos testified that even if Mellon's allowed claim was $105,000, Debtor's expenses exceed his net income by $176. Assuming that Debtor could break even, there would be no funds available for contingencies.

Sipos testified that Debtor's change in spending habits might be a significant factor in his analysis, depending on when it occurred and what it entailed. These additional factors will determine what weight to give the change. In this case some of those factors are: (1) Debtor's professed changes in spending habits are recent, (2) the change has not enabled him to meet his monthly expenses, and (3) this case is two years old and Debtor made no attempt to reduce expenses pre- or postpetition in order to pay his creditors until several months ago. Based on the foregoing, we find Debtor's recent change in spending habits not to be persuasive evidence of his long-term ability to make payments over the almost 17 years of the proposed plan term.[37]

■ Even if Debtor could make the proposed plan payments accounting for all expenses as detailed above, the plan is not confirmable. Sipos calculated the payments that Debtor would have to make if his plan were confirmed. He concluded that Debtor would have to pay administrative costs of $18,995 but, as of October 31, 1996, had cash

---

**33.** Debtor usually listed vehicle expenses at around $80 per month.

**34.** Donovan assumed a two percent wage increase and a two percent expense increase.

**35.** In his Response to Motion to Convert Case to One Under Chapter 7 Debtor avers that his anticipated monthly net income will be $3,375. Exhibit 3A, however, was admitted into evidence and is a pay stub dated January 15, 1997. The pay stub shows that his net pay for two weeks is $1,523.31 or $3,046.62. We accept the lower figure based on the evidence.

**36.** Unsecured creditors have the option to receive payment of 20 percent of their claims on the Plan Effective Date or be paid 100 percent at six percent interest over 72 months, beginning 37 months after the Plan Effective Date. See Plan of Reorganization, Docket Entry 15, at Article IV, ¶ 4.05.

**37.** Debtor testified that his attorney never told him that he should eliminate what he terms "extraordinary" expenses. Debtor has been an employee of Mellon for 27 years and is a vice president involved in investments and borrowing for the bank. His failure to meet his obligations cannot be attributed to his attorney.

of only $5,258. He also analyzed plan payments based on an obligation to Mellon of $117,000 rather than $95,000 as proposed in the plan. Repayment of the larger amount will require higher payments over the plan term or require that the proposed repayment schedule under the plan be extended an additional 9.9 years.[38] The result is a negative amortization of Mellon's claim for the first six years of the plan. He concluded that there would be an increasingly negative monthly cash flow over time. In 1997 the amount would be <$292$ per month. In 2003 it would average <$589$. Cash flow would turn positive only in the year 2012. Thus, Debtor has and will have insufficient cash to satisfy his obligations. We credit this witness' testimony. Therefore, we find that, based on the testimony and other evidence, the proposed plan payments are insufficient to properly amortize the debt to Mellon and that the plan as proposed is not feasible. We further find that the plan is not fair and equitable with respect to Mellon inasmuch as it will result in negative amortization of Mellon's allowed claim of $125,391.90 and will extend the term of the mortgage repayment unreasonably, given the high risk that Debtor will default due to insufficient income.

### C. Loans of Similar Character: GMAC v. Jones

An issue arose concerning whether *GMAC v. Jones*, 999 F.2d 63 (3d Cir.1993), applies. In that case, the Court of Appeals for the Third Circuit was called upon to determine the interest rate that would provide a secured creditor in a chapter 13 case payments of a present value equal to the value of its allowed secured claim. The court held that the interest rate was what "the secured creditor would charge, at the effective date of the plan, for a loan similar in character, amount and duration to the credit which the creditor will be required to extend under the plan." 999 F.2d at 65. The court noted that in cramdown situations the secured creditor is forced to continue a lending relationship with the debtor past the original term of the agreement between the parties. This situation forces the creditor to assume the cost of capital over the period of deferral as well as the cost of the lending relationship. The interest rate compensates the secured creditor. The appropriate rate to be paid through the plan is what the creditor would accept for a voluntary loan of similar character, amount, and duration. *Id.* at 67. The court defined "loan of similar character' " in a footnote as

> a loan that the creditor regularly extends to other debtors who are not in bankruptcy but who are otherwise similarly situated to the debtor ... and who are seeking the same kind of credit (*e.g.*, auto loan, home equity loan, etc.).

*Id.* at 67, n. 4. That is, the lender must first be willing to make a loan of similar character, amount, and duration. Then the applicant must be similarly situated to those with whom the lender otherwise regularly deals. Once these factors are established, the question becomes one of the proper interest rate. Debtor argues that under *GMAC v. Jones* Mellon must consider Debtor as an applicant as though there had been no bankruptcy and no default. Mellon contends that it would not voluntarily make a loan with modifications like those proposed in the plan to Debtor or to anyone similarly situated who was not in bankruptcy.

The evidence that Mellon would not make a loan with characteristics as proposed by Debtor and to one similarly situated to Debtor outside of bankruptcy was overwhelm-

---

**38.** At $95,000 the plan period will continue to 2013. Exhibit 39. At $117,000 the repayment will be extended to the year 2024. The original 30 year mortgage term would have expired in 2015 (1985 + 30). The refinanced 15 year term will expire in 2001. Michael Innes–Thompson of Mellon Bank testified about mortgage interest rates as of the date of trial. For a 30 year mortgage the interest rates ranged from 8.5 to 7.625, depending on points. The 20 year rate ranged from 8.375 to 8.000, depending on points. The interest rate is substantially similar to what Debtor proposes in his plan. However, the plan does not provide for increases in real estate taxes which increased 42.6 percent between 1987 and 1996. These factors, plus Debtor's consistently demonstrated inability to meet

ing.[39] Under the plan, Mellon's debt would be negatively amortized. Furthermore, the term would be extended to a total of almost 40 years and the testimony was uncontradicted that no lending institution would make a loan of that duration. Even if we construed the plan as creating a new loan with an approximate duration of 17 years, we credit Mellon's witnesses who testified that Mellon does not extend 17 year loans, does not lend when the loan will negatively amortize, and does not accept mortgage payments on a twice-per-month basis as proposed by Debtor's plan. Debtor points out that 8.25 percent is a reasonable interest rate for the term proposed by the plan. Debtor contends that because Mellon makes 30 year loans and accepts an interest rate of 8.25 percent it must be forced to accept the terms of the plan. We agree that 8.25 percent is a market rate within the range that Mellon would charge if it would make a loan. However, even at that rate the mortgage will be negatively amortized under the plan. We find that Mellon would not lend to anyone under these circumstances, regardless of the market interest rate.

Debtor's argument that *GMAC v. Jones* means that under no circumstances shall credit history be considered by a lender lacks any persuasive effect and belies economic reality. Furthermore, the Court of Appeals applied as a standard the lender's practices concerning applicants who are not in bankruptcy but who otherwise are similarly situated to Debtor. *Jones* does not require or even suggest that a lender must abandon its regular practices when the applicant is a bankruptcy debtor.

The evidence that Mellon would not lend to anyone whose financial situation, creditworthiness and capacity to repay is similar to Debtor's was uncontradicted. Mellon produced several witnesses who explained why Mellon would not make a loan as proposed by Debtor. Debtor called Michael Innes–Thompson, manager of quality assurance and regulatory compliance for Mellon Mortgage Company, and a regional underwriting manager. He is an expert in residential mortgage underwriting lending policies. As a regional underwriting manager he oversees wholesale and retail underwriting and supervises the underwriters whose job it is to determine whether Mellon should make a particular loan. Innes–Thompson reviewed the mortgage file, income information, appraisal, tax returns, and credit report to determine whether Mellon would lend to someone in Debtor's economic position. He based his conclusion on the credit report, the collateral, and Debtor's capacity to repay. He also testified as to whether Mellon would lend to one in Debtor's Position based on loan amounts of $95,000.00, $105,000.00, and $117,000.00. In this regard, three factors, referred to by the witness as "the 3 Cs", are evaluated. These factors are creditworthiness, capacity to repay, and collateral.

***Creditworthiness.*** On examination by Debtor's counsel, Mr. Innes–Thompson testified that "excellent credit" means that, within the past 24 months, the borrower has no significant late payments; i.e., (1) was not late on a payment more than twice for more than 30 days; (2) was never late on a mortgage or rent payment; (3) was not late more than once for 60 days on an installment account; or (4) was not late more than twice for 30 days on another account.

"Good credit" is subjective. If there is a reasonable explanation for more than two late payments of 30 days or more than one late payment of 60 days, Mellon can consider whether to make a loan. The credit established in the past and any "derogatory comments" are considered. A "derogatory" entry is *any* entry of a late payment. The lender also considers whether the late payments are due to the applicant's disregard

his day-to-day and month-to-month expenses, establish that the plan is not feasible.

**39.** The Court of Appeals in *GMAC v. Jones* noted that certain aspects of the bankruptcy process counter a debtor's credit history and an absence of an equity cushion. As an example the court cited a debtors' "demonstrated commitment and increased incentive not to default once in bankruptcy. Moreover, the plan of repayment will have been reviewed and approved by the court as feasible in the light of the debtor's repayment capacity." 999 F.2d at 69 and n. 8. In the matter before us the plan is not feasible and there is no persuasive evidence that he has the capacity to repay.

for making timely payments or to factors beyond his control. Exhibit 35, (Mellon's) Underwriting Guidelines: Credit History: Review and Followup, at 1400.1. Divorce often is a factor used to explain a default, but each case is reviewed independently in light of credit history and whether credit has been reestablished.[40] The underwriting guidelines further provide, and Innes–Thompson testified, that a mortgage generally will not be given if the applicant has been a defendant in mortgage foreclosure in the past three years. *Id.* at 1415.1. An exception may exist if the foreclosure was the result of extenuating circumstances such as "serious, long-term illness; death of the principal wage-earner; or loss of employment" due to such things as reductions-in-force and factory shutdowns. *Id.* The fact of a serious illness or unemployment may qualify as a reasonable explanation but does not dictate the ultimate result. Marital difficulties alone are not a justification for default. Mellon distinguishes between the situation in which an ex-spouse has been ordered by a court to make the payments and defaulted and the situation in which the person obligated under the loan defaulted. To make that determination, the underwriter "must evaluate the age of any account that reflects late payments, the frequency and severity of the late payments, the size of the account balance, and the status of the applicant's other credit accounts." *Id.* at 1400.1.

*Credit scoring* is another evaluation tool used to determine creditworthiness. Credit scoring illustrates what the borrower's likely default would be.[41] Scores below 620 indicate that the likelihood of default is eight times greater than a score over 620. Debtor's credit score was 538. Innes–Thompson explained that Fair Isaac and Company does credit scoring and retrieves information from three major credit repositories where the credit score is kept. The factors include age of account, frequency of use, the total approved amount of credit and how much debt there is relative to the credit limit. If the borrower's credit is close to its limit, a score less than 620 could be achieved, even if the borrower has not been late on any payments. The number of inquiries on an account over a certain period is another factor. The witness testified that credit scoring has been shown to be statistically reliable but cannot be used to deny credit. Although it is considered, it is not dispositive.

Every applicant for credit is given an opportunity by Mellon to explain his credit history, inasmuch as some entries which might be considered derogatory in a vacuum may be subject to dispute. If credit is reestablished for at least a 12 month period, Mellon may consider the application favorably. In this case, Debtor has not reestablished credit and there has been no explanation for the derogatory items that would recast them in a favorable light. Debtor's use of credit cards to maintain his mortgage also is considered a negative factor. Debtor has not rebutted Mellon's evidence that shows Mellon would not make a loan like that proposed in the plan to anyone with his creditworthiness factors.

*Capacity to Repay.* When the mortgage was refinanced in 1986 Debtor's salary was $41,500 but his ex-wife's $29,950 annual income provided a total household income of $71,450. Other debt was $17,696, according to Debtor. When he filed this chapter 11 his general unsecured debt was over $24,000 and he owed priority claims of over $7,500.[42] As of August 31, 1996, Debtor's annual income

40. The bank will examine whether the account was brought current and whether the delinquencies were limited to the period of illness or unemployment.

41. How the scoring is done is proprietary information and this witness did not know how an excellent credit increases a score. Debtor argued that Mellon would have approved the proposal if Debtor had excellent credit history but this is a mischaracterization of Innes–Thompson's testimony. Innes–Thompson testified that an excellent credit history might affect Mellon's decision but did not guarantee that Debtor would get the loan. In any event, Debtor does not have an excellent credit history.

42. The parties stipulated that, as of June 23, 1996, Carol Crystian's annual income was $29,520. However, Mrs. Crystian is not a party to this action and is not contributing to mortgage payments. Debtor testified that he is making all the payments himself. Pursuant to their divorce settlement in June of 1995, Debtor paid his ex-wife $5,000 for her interest in the property.

was $54,900. His monthly net income was $2,943.64 at that time.[43] Thus, the income on which Mellon calculated loan eligibility significantly decreased and the debt significantly increased from the time of the original mortgage and its refinance.

Innes–Thompson stated that an applicant's capacity to repay is defined as the ability to carry the mortgage debt and all other obligations existing at the time of the application. A housing to expense ratio is calculated based on the applicant's gross monthly income. Expenses included in this calculation include taxes, insurance, and mortgages. The factors used by Mellon are consistent with FNMA and FMAC. Mellon uses a ratio of 28 percent housing expense to income as its guideline. Innes–Thompson calculated the housing expense to income ratios. At $95,000, the housing expense to income ratio is 37 percent and the debt to income ratio is 47 percent. At $105,000 the ratios are 39.34 and 49.02 percent. At $117,000, the ratios are 41.83 and 51.52 percent. In any case, Mellon's guideline ratios are exceeded and no compensating factors were established.

Mellon also considers the applicant's debt to income ratio. This includes all expenses, i.e., housing expense plus all long-term obligations and revolving debts, installment obligations, support payments, and other verified debts. Mellon uses a ratio of 36 percent debt to income ratio as its guideline.

Innes–Thompson testified that he disagrees with Debtor's calculation of debt to income and housing to income ratios (Exhibit 42) but, even assuming that Debtor's calculation was correct, the ratios still exceed the 28 and 36 percent requirements; i.e., the debt to income ratio according to Exhibit 42 was 44.7 percent in December of 1996. Historically, Debtor had approximately 30 percent more income in 1986 when he and his wife refinanced this loan than he has now. His 1996 proposal is similar to the 1986 payments but made with 30 percent less income. This significantly affects the ratio.

Debtor countered Mellon's evidence with the argument that the housing expense to income ratio per Mellon's guideline is 28 percent and the plan ratio is 33 percent. The debt to income ratio is 36 percent according to Mellon's guidelines and the plan ratio is 43 percent. Although Debtor does not consider this difference significant, the testimony and evidence established that it is. When the ratios increase over the maximum, Mellon looks at the borrower's ability to carry a similar housing payment. This is the single most important factor considered. Debtor has not demonstrated an ability to make the payment. If an applicant has demonstrated an ability to carry the debt and equity even *with* high ratios, the decision might be different but, again, the current situation does not fit within these parameters. Debtor's income is insufficient to allow him to meet his expenses on a long-term basis. Even during the bankruptcy Debtor had negative cash flow in many months.[44] The evidence of his expenses in the past six months is not controlling. It is too short-term and does not account for all of his expenditures.

Recent history is not helpful to Debtor. He made no payments postpetition until this court entered an adequate protection order three months into the case. There is an escrow deficiency. Debtor had a negative cash flow during the chapter 11 and failed to cut expenses until the last minute, six months after the first plan confirmation hearing and in preparation for this trial. Even then, Debtor could not meet all of his expenses. Debtor admitted at trial that his mortgage default was caused initially by the divorce which led to his loss of the benefit of his spouse's income. *See also* Debtor's Response to Mellon Bank's § 506 Application for Allowance or Reimbursement of Fees and Expenses Paid By Oversecured Creditor, at ¶ 24, Docket Entry 118. Debtor also admits that he cannot pay the full amounts of both mortgages ($2,200 per month) on his gross income of approximately $4,600 (net of approximately $3,000). *See* Exhibit 3A. His

---

**43.** Debtor's net income as reflected on recent monthly financial statements is slightly more than $3,000 per month. His gross monthly income is approximately $4,600.

**44.** Debtor's operating reports (cash receipts and disbursements) filed since the trial continue to reflect negative monthly cash flow in most months.

total expenses as established by the evidence and testimony, including some plan payments, but excluding escrow payments of $396.48, medical expenses, and expenses for Rhyan, will total $3,040.86.[45]

*Collateral.* Consideration of the collateral is the next prong of the inquiry. The collateral is examined to determine whether there is sufficient equity to protect the mortgage amount if the borrower does not repay as agreed. The maximum under the program is 97 percent but most borrowings are restricted to 95 percent of the lesser of sales price or value. For owner-occupied refinances, the percentage is 90 percent. Refinances involving home equity loans are limited to 75 percent. In this case, if Mellon's claim is $95,000, as provided in the plan, the payment would be $713.71, principal and interest, at 8.25 percent interest, on a 30 year mortgage. The payment increases to $1,149.79 with taxes and insurance added. Debtor has other debt of $46,382, a second mortgage of $393.42 per month (adequate protection payment), support payments of $443 per month, and installment payments of $51.35 each month. Innes–Thompson testified that under these facts, the loan to value ratio is 50 percent. Although there is equity in this property over and above Mellon's mortgage, this factor is not dispositive. Although the house was appraised at $190,000, it needs some repairs—the basement has developed a leak and the house needs to be painted. The value of the collateral, although greater than Mellon's allowed secured claim, including fees and expenses, of $125,391.90, is not a sufficient basis upon which to confirm this plan which negatively amortizes Mellon's claim at the allowed amount, does not provide for curing the escrow deficiency, and is not feasible.

Innes–Thompson testified that even if the collateral was worth $200,000 and the loan request was $95,000, Mellon would not lend because of Debtor's credit history and the fact that the qualifying ratios are not met. There are no mortgage programs in effect at Mellon akin to what Debtor proposes in his plan and Mellon is not aware of any at other institutions.

Although the plan does not propose a refinance, Innes–Thompson was questioned about Mellon's policies. He testified that Mellon would approve such a loan as a refinance with no equity taken out if there were no derogatory factors. In this case, however, there are derogatory factors: (1) Debtor's income is less than what it was when the property was refinanced in 1986; (2) Even without the loss of income, there has been a default and institution of a mortgage foreclosure action. In this situation the borrower would have to reestablish credit in order for Mellon to make the loan. Debtor has not done so. (3) Rather than seeking to refinance at the time he lost income, Debtor increased his debt. Mellon is not inclined to lend under circumstances of default and the significant increase in debt. This Debtor did not demonstrate financial responsibility. We find that Mellon would not make a loan to a person not in bankruptcy but otherwise similarly situated to Debtor.

## II. *MELLON'S MOTION TO CONVERT*

Mellon seeks conversion on the ground that Debtor does not have sufficient cash flow to make the plan payments which must be in excess of the adequate protection payments in order to include the necessary escrow amounts. Debtor asserts that the plan should be confirmed because he has reduced his expenses and because Mellon is protected by the equity in the property. Debtor's reduction in expenses is recent and, as the testimony made clear, still has not provided him with sufficient cash flow to meet his obligations, even with a recent increase in his salary. The equity in the property has been considered as a factor in rating the collateral for purposes of adequate protection payments but is not sufficient, coupled with Debtor's income, for the court to find this plan feasible. Because the testimony and evidence established that the plan is based on incorrect assumptions concerning the amount of Mellon's claim and Debtor's ex-

**45.** Moreover, payments to the City of Pittsburgh, the Internal Revenue Service, and unsecured creditors are not included in the $3,040.86 calculation. We also note that Debtor's actual net pay for a four week period is $3,046.62.

penses, we find that it does not comply with 11 U.S.C. § 1129(b)(2)(A)(i)(II). Subsection (b)(2)(A)(i)(II) provides·that, to be fair and equitable, the plan must provide that holders of secured claims

> receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

11 U.S.C. § 1129(b)(2)(A)(i)(II). Debtor's plan significantly underestimates Mellon's claim (i.e., Debtor assumes a $95,000 claim but the allowed claim will be $125,391.90). The testimony that under the plan (1) Mellon's claim would be negatively amortized, (2) the payment stream would not equal the allowed claim, and (3) the proposed plan payments are insufficient to fund the escrow to cover the tax obligations that Mellon has been paying was uncontradicted. Thus, the plan does not propose to pay Mellon as required by § 1129, even though Mellon is oversecured, and the confirmation standards are not met.

Moreover, the plan as proposed is not feasible.[46] The proposed payments are insufficient, do not account for the real estate tax escrow, and Debtor does not have enough income to sustain the plan payments he proposes, in addition to his other expenses. Debtor simply does not have the financial capacity to formulate a feasible plan to pay Mellon's $125,391.90 claim plus Debtor's other obligations within a reasonable period of time.[47]

---

**46.** Debtor's Disclosure Statement contains Exhibit C, a schedule of plan payments which differs from the proposed plan. This schedule fails to include payments to the City of Pittsburgh or for real estate taxes owed. Either proposal is not feasible for the reasons expressed herein.

**47.** Mellon also complains that the plan unfairly discriminates against it because the second mortgagee's interest rate is higher (ten percent as opposed to 8.25 percent) and the term is extended only two years as opposed to 17 years. On the facts of this case, we disagree. In *In re Dilts*,

126 B.R. 470 (Bankr.W.D.Pa.1991), the first mortgagee, argued that its claim was subject to discriminatory treatment under the plan because the plan impaired its claim while leaving that of a second mortgagee unimpaired. The court rejected the argument in light of the debtor's amended plan which extended the term and changed the interest rate of both mortgages. Accordingly, the plan in this case is not unfairly discriminatory on the basis of *Dilts* because the junior mortgagee in this case is also impaired.